# Richmond

## MARSHALL W. COOK AND LENORE M. COOK V. JAMES R. HAYDEN.

October 9, 1944.

Record No. 2864.

Present, All the Justices.

The opinion states the case.

*Forest T. Taylor* and *J. Wesley Taylor*, for the appellants.

*Peyton Cochran, Archibald G. Robertson* and *Hunton, Williams, Anderson, Gay & Moore*, for the appellee.

EGGLESTON, J., delivered the opinion of the court.

James R. Hayden filed his bill of complaint in the court below seeking to set aside a deed dated February 28, 1942, and recorded in the Clerk's Office of the Circuit Court of Augusta county on July 10, 1942, whereby the plaintiff had conveyed to the defendants below, Marshall W. Cook and Lenore M. Cook, his wife, certain real estate in Augusta county. It was alleged that the conveyance was induced and procured by the Cooks through fraud. A demurrer to the bill was overruled and the defendants answered denying the

allegations of fraud and all facts from which it might have been inferred. At the request of both sides the evidence was heard *ore tenus* by the trial court, after which it entered a decree sustaining the allegations of the plaintiff, decreeing and holding that the deed was obtained by fraud, and ordering it to be canceled and rescinded. From this decree the Cooks have appealed. For convenience we refer to the parties as they appeared in the court below.

The first assignment of error challenges the action of the court in overruling the demurrer to the bill. The argument is that the allegations of fraud are too vague and indefinite; "that the circumstances surrounding the alleged fraud are not specifically set out in detail, so that the defendants would have an opportunity of knowing what they would have to meet."

The bill alleges, in substance, that the plaintiff is a bachelor, eighty-three years of age; that he acquired and has been residing on the land since 1928; that shortly after purchasing the property he engaged Mrs. Cook and her husband as housekeeper and caretaker, respectively; that to his "consternation and amazement" he learned in July, 1942, that there had been recorded in the Clerk's Office of the Circuit Court of Augusta county a deed purporting to have been signed by him, conveying the property to the Cooks in consideration of their having "looked after and supplied his worldly wants and needs in a most generous manner for a period of many years," and in further consideration that they would "care for and maintain" him so long as he might live and see that he was "decently buried as befitting his station in life;" that under the terms of the deed there had been reserved to him, the plaintiff, a life interest in the property; that at the date of the purported deed he was "aged, infirm and ill and with poor eyesight and, in fact, nearly blind," as a result of which he was "wholly incapacitated from attending properly to his business affairs;" that he had "no recollection whatsoever of having executed any such deed;" that if in fact he had signed such an instrument the defendants had procured his signature thereto by fraud

when he did not know or understand its contents or purport; that there was no consideration for the conveyance since he had fully compensated the defendants for their care, attention and services; and that he had not agreed, nor was there any occasion for his agreeing, that the defendants were to care for him during the rest of his days and give him a decent burial, since he had ample income and property for that purpose.

In our opinion, these allegations, if true, were sufficient to require a cancellation of the deed.

Moreover, the record shows that at the hearings on December 16, 17 and 18, the plaintiff put on his evidence in chief, and a recess was taken until January 18, when the defendants commenced the taking of their evidence. It is manifest, then, that the defendants were not taken by surprise, for before they began the taking of their evidence they were fully aware of the nature of the plaintiff's case and just what they, the defendants, would have to meet.

We come, then, to the merits. Here the defendants contend that the evidence is insufficient to sustain the findings of the trial court that the execution and delivery of the deed were procured by their fraud, and that for that reason the instrument should be rescinded and canceled.

The case presents no new legal problem. We have many times said that he who alleges fraud must clearly and distinctly prove it. But it is not necessary that fraud be proved by direct and positive evidence. Circumstantial evidence is not only sufficient, but in most cases is the only proof that can be adduced. *Todd* v. *Sykes*, 97 Va. 143, 147, 33 S. E. 517, and cases there cited; *Flanagan* v. *Parsons*, 167 Va. 6, 11, 187 S. E. 473, 475. Moreover, "A transaction may of itself and by itself furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendant and even the evidence of witnesses." *Todd* v. *Sykes, supra* (97 Va., at page 147). See also, *Long* v. *Harrison*, 134 Va. 424, 444, 114 S. E. 656; *Strickland* v. *Ayers*, 159 Va. 311, 325, 165 S. E. 387. The same is true of undue

influence which is a species of fraud. *Price* v. *Barham*, 147 Va. 478, 482, 137 S. E. 511.

The appellants do not dispute these principles, but they insist that the findings of the trial court are contrary to the weight of the evidence. While they concede that the evidence is conflicting, they argue that the issues of fact should have been determined in their favor.

It is well settled in this State that where the trial court hears the witnesses testify, observes their demeanor, and weighs their conflicting statements, its findings of fact have the same weight as the verdict of a jury and are binding on us unless they are plainly wrong or without evidence to support them. *Henrico County* v. *Richmond*, 177 Va. 754, 782, 15 S. E. (2d) 309, 318, citing numerous cases. See also, *Forbes* v. *Forbes*, 182 Va. 636, 640, 29 S. E. (2d) 829, 831; *Lowdon* v. *Lowdon*, *ante*, p. 78, 31 S. E. (2d) 271.

As was said in *Planters Nat. Bank* v. *Heflin Co.*, 166 Va. 166, 172, 184 S. E. 216, 218: "If there is credible evidence to support the chancellor's judgment we must accept it, just as we must accept a jury's verdict sustained by evidence which it might have believed." See also, *Henrico County* v. *Richmond*, *supra* (177 Va., at page 782, 15 S. E. (2d), at page 318).

The property which is the subject of this litigation is situated near Augusta Springs, in Augusta county, and contains approximately 643 acres. On it is located a large dwelling house and other buildings. It is assessed at $13,540, and, according to the plaintiff's witnesses, is worth from $20,000 to $25,000. It was acquired in 1928 by the plaintiff, who was unmarried, about sixty-eight years of age, and whose closest relatives were a niece, Miss Louise Hayden, and her mother, Mrs. Katherine Hayden, who resided in Washington, D. C. The plaintiff had been in business for many years in the middle west with several of his brothers, all of whom were dead, and had accumulated extensive and valuable property holdings in Stafford and Arlington counties, Virginia, Washington, D. C., Keyser, West Virginia, and Florida.

In 1930 the plaintiff, through Edward Patterson, a friend, from whom he had purchased the Augusta county property, met and engaged the services of Marshall W. Cook and his wife, who came to live on the property. The Cooks first occupied one of the cottages but later moved into the mansion house. Mrs. Cook ran the household and was allowed to take in boarders from among the schoolteachers and mill-workers in the neighborhood. The plaintiff likewise boarded with her.

According to the Cooks, Mrs. Cook was to furnish board to the plaintiff, take care of his rooms in the mansion house, have his laundry done, and look after his needs and comfort. In his spare time Cook was to look after the livestock and do the necessary outside work on the premises. During the entire period of their occupancy of the plaintiff's property, Cook was employed at various industrial plants in the vicinity at a small salary. He was illiterate but his wife was educated and had been a schoolteacher. While the Cooks occupied the cottage they paid the plaintiff $10 per month rent, but this payment ended when they moved into the mansion house, about 1937 or 1938.

The Cooks further testified that the plaintiff furnished none of the provisions for the house and paid them nothing for their services during the entire twelve years of their service to him. They said that he frequently promised them that if their services were "satisfactory" he would "provide liberally" for them "some day;" that they knew that he was a man of means; that they trusted him, and accordingly made no demands on him for any payments of money or contributions to the expenses of the household, or even his own sustenance, other than the small electric light bills and a portion of the fuel bills. They further said that except for small Christmas gifts, the plaintiff made them no presents which could be interpreted as compensation for their services.

Other witnesses corroborated the Cooks' testimony that they had heard the plaintiff say that he was going to deed the place to them in consideration of their services.

This most vital testimony on behalf of the Cooks is flatly contradicted by the plaintiff and his witnesses. He testified that while the Cooks were kind to him and looked after his needs and properly took care of the property, he fully and regularly paid them therefor; that he regarded them merely as his servants or employees and had no affection for them beyond that which resulted from a satisfactory domestic arrangement.

There is strong evidence that the plaintiff had been devoted to his brothers, with whom he had been associated in business; that he had promised his brother, Lawrence, on the latter's deathbed, that he (the plaintiff) would care for that brother's widow, Mrs. Katherine Hayden, and her daughter, Louise; that he was devoted to these relatives, had given them considerable property, and had frequently said that he intended to leave them all of his remaining property. This is corroborated by the testimony of Emory Tyler, a reputable attorney of Keyser, West Virginia, who looked after the plaintiff's large property interests in that locality and was his confidential adviser. According to Mr. Tyler, the plaintiff discussed with him, from time to time, whether this disposition of the property should be made by deed or by will, and he (Tyler) advised the former course in order to avoid the payment of inheritance taxes. The evidence further shows that in furtherance of this purpose, in July, 1941, the plaintiff had had prepared in Washington deeds conveying to Mrs. Hayden and her daughter several pieces of property, including that which is the subject of this litigation. However, the plaintiff left Washington unexpectedly before executing these instruments which he left with Mrs. Hayden.

According to the Cooks, in the spring of 1941, the plaintiff expressed the desire to deed the Augusta Springs property to them, and asked them to refer him to an attorney. They recommended to the plaintiff Mr. Charles Curry of the Staunton Bar, who, at the plaintiff's request, transmitted through Cook, called to see the plaintiff in April, 1941. Mr. Curry did not testify. Cook testified that he was present at this interview; that the plaintiff told Mr. Curry of his desire

to convey a portion of the Augusta Springs property to the Cooks; that Mr. Curry advised against this unless a survey was had of that portion of the property to be conveyed; that the plaintiff did not see the necessity of such a survey; and that the conference was ended without any definite arrangement being made for the preparation of a deed. Cook paid Mr. Curry for his services, but said that the plaintiff reimbursed him.

According to Mrs. Cook, on February 27, 1942, the plaintiff asked her to phone Mr. Curry to come to see him again. She gave this message to Mr. Curry who was unable or declined to come and sent in his stead Mr. Saunders, a member of the Staunton Bar and a court reporter, who occupied office space with Mr. Curry. Saunders testified that the plaintiff requested him to prepare a deed conveying to the Cooks the Augusta Springs property in consideration of their past and future services to him, reserving to the plaintiff a life estate in the property, and reserving from the conveyance the church building on a part of the land, an acre of the adjoining land to be used as a cemetery, and a right of way thereto.

Saunders prepared the deed in accordance with these instructions, and after showing it to Mr. Curry, took it to the plaintiff for execution the next day, February 28. According to Saunders, he read the deed to the plaintiff who took it and read it himself. The plaintiff appeared to be satisfied with it and signed and acknowledged it. Saunders filled in and signed the notarial certificate and delivered the deed to the plaintiff who handed it to Cook. The plaintiff paid Saunders for his services.

Although Mrs. Cook had accounts at two other banks, she rented a lockbox at the Valley National Bank in Staunton and deposited the deed therein for safekeeping. She said that this was in accordance with the plaintiff's instructions, who was to tell her when to record it.

During the spring and early summer of 1942, Mrs. Katherine Hayden and Miss Louise Hayden became alarmed because the plaintiff had ceased his frequent visits to them and

also because they were unable to hear directly from him. On a number of occasions they had telephoned his residence and had been given various excuses by Mrs. Cook why he could not come to the telephone. On July 3 of that year, Mrs. Hayden went to Augusta Springs to see the plaintiff and was shocked at both his physical and mental condition. She found that he was feeble, emaciated, nearly blind, and did not at first know her. She remained at the plaintiff's residence until July 7, and during her visit his mind seemed to clear. He expressed the desire to sign the several deeds which he had had prepared in July, 1941, conveying the several properties to her and her daughter. Accordingly, Mrs. Hayden presented the deeds to him, he signed them, and his signature to each was witnessed by both of the Cooks.

According to Mrs. Hayden, the plaintiff signed the instruments with extreme difficulty and only after Mrs. Cook had pointed out the places for his signature. An inspection of the signatures to the deeds, which are before us as original exhibits, corroborates Mrs. Hayden as to this. The Cooks offered no objection to the plaintiff's execution of the deed conveying the Augusta Springs property to the Haydens, nor did they then disclose to Mrs. Hayden that he had previously conveyed it to them. Their excuse is that they were told by Mrs. Hayden and believed that they were witnessing the plaintiff's signature to applications for bomb insurance. Each of the instruments, however, was typewritten in the usual form, bound with a customary manuscript cover, and plainly marked "Deed."

When Mrs. Hayden arrived at Washington her daughter suggested that the plaintiff should be brought to their home, and on July 9 Mrs. Hayden returned to Augusta Springs for that purpose. In the meantime the plaintiff's Washington real estate agent had informed Mrs. Hayden that the deeds which Mr. Hayden had signed, and the Cooks had witnessed, should be acknowledged before a notary. Therefore, she took the deeds with her when she returned to Augusta Springs. Upon alighting from the train she

asked the station agent to direct her to a taxi as well as to a notary. He directed her to Mrs. Elliott who drove a cab and was also licensed as a notary. Mrs. Hayden went to the plaintiff's room and informed him that she had brought the deeds and a notary public to take his acknowledgment. At his direction Mrs. Elliott, the notary, came into the room. Mrs. Cook also entered. There is a sharp conflict in the evidence as to just what transpired there.

Mrs. Elliott testified that Mrs. Hayden had informed her, *en route* to the plaintiff's residence, that she desired notarial certificates to be filled out on certain war risk insurance papers; that when she (Mrs. Elliott) began to read the deed conveying the Augusta Springs property to the Haydens, he (the plaintiff) "became furious" and refused to "sign it;" and that Mrs. Cook then remarked that he had conveyed the property to her and her husband. In the main Mrs. Cook corroborated the testimony of the notary, but both of them overlooked the most pertinent fact that the deed had already been signed by the plaintiff and witnessed by the Cooks, hence there was no occasion for the plaintiff's signing or refusing to sign it.

Mrs. Elliott admitted, on cross-examination, that she was an intimate friend of the Cooks, and that about "a week or two" after the above occurrence Mrs. Cook gave her a check for $25. But she insisted that the payment was made by a "typewritten" check signed by the plaintiff and carrying in his handwriting a notation "in appreciation." No such check appears to have been produced or accounted for.

According to Mrs. Hayden, this is what happened: When Mrs. Elliott asked the plaintiff whether he had read the deed to the Augusta Springs property he said that he had, and that it was in accordance with his desire that the property should go to Mrs. Hayden and her daughter. Mrs. Cook then interposed saying: "You cannot do that; you gave this deed to the lawyer." The plaintiff replied: "What lawyer?" To this inquiry Mrs. Cook did not reply, and the plaintiff further said: "I want to know what lawyer. I never gave my property to any lawyer. I want Mrs. Hayden and her

daughter to have everything I have got." The plaintiff then directed Mrs. Elliott to leave, gathered up the deeds and put them in his desk. After Mrs. Elliott and Mrs. Cook had left the room the plaintiff said to Mrs. Hayden: "Did you hear what Mrs. Cook said? That I gave this property to a lawyer. I never gave my property to a lawyer and I never saw him."

Mrs. Hayden said that the plaintiff requested her to go the next day to the clerk's office in Staunton and ascertain whether any such deed as had been mentioned by Mrs. Cook had been recorded. She did so and found no such deed of record.

On the same day, July 10, and shortly after Mrs. Hayden had left the clerk's office, Mrs. Cook brought in the deed whereby the plaintiff had conveyed the property to her and her husband. According to her; she withdrew it from the lockbox at the bank and recorded it at the express direction of the plaintiff, who gave her the money to pay the recordation costs.

When Mrs. Hayden returned to the plaintiff's home, about noon on July 10, she found the front door locked and both the Cooks and the plaintiff were missing. She was informed by the colored maid that she had been instructed by Mrs. Cook to tell her that the plaintiff had gone to Washington and from there to Florida, and that he would not be back for a "long time." Mrs. Hayden likewise found that the deeds which the plaintiff had executed and was preparing to acknowledge were missing. Late in the afternoon the Cooks returned home and told her that the plaintiff had gone to Keyser, West Virginia. The next afternoon, after an absence of several hours, the Cooks returned bringing the plaintiff with them. Mr. Hayden was confused and unable to tell where he had been. Mrs. Hayden accused the Cooks of having kidnapped him and of having taken the deeds. The latter were found in a woodbox under circumstances which justified the inference that they had been placed there by one of the Cooks.

In the meantime sharp words had passed between Mrs. Hayden and the Cooks, and the latter ordered her to leave the premises. She declined to do so, saying that she intended to take the plaintiff with her to Washington the next day. Thereupon Cook telephoned the plaintiff's local physician, Dr. Hankins, asking him to call and tell the plaintiff that he (the plaintiff) was in no condition to make the trip. Dr. Hankins declined to come, and the plaintiff went to Washington with Mrs. Hayden on July 14. According to his witnesses, he was so feeble that he had to be assisted to the train.

On July 18, 1942, the plaintiff completed the execution and acknowledgment of the deeds conveying the several properties to his niece and sister-in-law, after the dates thereon had been changed from 1941 to 1942.

On behalf of the Cooks there is evidence that both at the time of Mr. Curry's visit to him in April, 1941, and at the time of the preparation and execution of the deed (February 27 and 28, 1942), the plaintiff was in vigorous health both mentally and physically. While Mr. Curry did not take the stand, such is the purport of the testimony of Cook who was present at the interview. According to the testimony of Saunders, the plaintiff fully understood the nature of the transaction both at the time the preparation of the deed was being discussed and the time of its execution on February 28.

There is other evidence on behalf of the Cooks that the plaintiff was entirely normal during the winter of 1941-1942; that this condition continued the same until he left Augusta Springs on July 14, 1942; and that he regularly read the daily newspapers and discussed their contents.

On the other hand, on behalf of the plaintiff there is strong evidence that he was not mentally competent during this same period.

Tyler testified that the plaintiff came to Keyser about October 22, 1941, and was there for two or three days in connection with a condemnation proceeding which he (Tyler) was handling for him; that the plaintiff was so forgetful

and "his mind was wavering" to such an extent that he was unwilling for him to testify in court. Accordingly, Tyler put the plaintiff on the train and sent him home. Tyler said that the plaintiff had been "going downhill physically for the last five or six years," and "was tottering in body and in mind on that occasion." He saw the plaintiff again in the latter part of January or early in February, 1942, with reference to the same litigation. His observation was that the plaintiff was in as "bad mental condition" as in the preceding October; that "he did not really know what he was doing, and did not know where he was. I did not consider he was in any condition to try a case and be used as a witness."

There is testimony which seriously reflects on the character and veracity of the Cooks and some of their main witnesses. The Cooks in turn attacked the character, integrity and motives of the Haydens, claiming that they were grasping after the plaintiff's property and were the real instigators of the present litigation. But none of the witnesses, not even the Cooks, attacked the character, integrity or credibility of the plaintiff himself. Indeed, Mrs. Cook admitted, on cross-examination, that he was a "good," just and "truthful man."

The plaintiff denied that he had entered into such a loose arrangement with the Cooks, as they testified to,—that is, that he had never paid them anything for their services, and that they worked for him over a period of twelve years upon the faith of his promise that "some day" he would liberally reward them for such services. On the contrary, he said that he "always paid them liberally" for their services, owed them nothing, had no intention of conveying any property to them, did not recall the interview either with Mr. Curry or Mr. Saunders, and had no recollection of having executed the deed in question. To use his words: "If I did, it was because I was sick and did not know what I was doing. I never intended to sign it. They took me out of a sick bed and took me to their home."

He further testified that his eyesight was very poor and had been so for more than a year before the hearing (December 18, 1942); that the sight of his right eye was entirely

gone; and that the sight of his left was almost gone. He testified at the hearing that he could not see the face of counsel who cross-examined him.

Dr. Guy R. Fisher, an eye, ear, nose and throat specialist of Staunton, testified that he had examined the plaintiff in January, 1943; that he had in both eyes "very dense cataracts" of gradual growth which made it impossible for him to see; and that, in his opinion, this condition had existed for "a year or two" prior to the date of the examination. There is no medical testimony to the contrary.

At the hearing the plaintiff's mind was plainly confused. He did not know where he was—whether in Washington or in Staunton, at what hotel he was staying, or in what year he was born. His condition was such as to cause the court to remark from the bench: "Mr. Hayden was one of the most pathetic figures that I have ever seen in court. It was obvious to a layman that he was suffering from *senile dementia.*" This is corroborated by the verbal testimony of the plaintiff's attorney, Tyler. There is likewise testimony that this condition was of gradual development and was apparent to other witnesses at least a year before the trial. As the trial court aptly said: "It is also well known that *senile dementia* is of gradual growth and may cover a long period of time, daily, weekly and monthly, affecting the life of the person." See *Redford* v. *Booker*, 166 Va. 561, 575, 185 S. E. 879, 885.

In their sworn answer the Cooks denied that the plaintiff had paid them for their services, or had given them any substantial sums of money which might be interpreted as such payment. It developed at the trial that during the year 1942 the plaintiff had given Mrs. Cook checks drawn on the Hamilton National Bank of Washington, dated and in these amounts: February 11, $2,000, March 20, $200, April 24, $200, May 12, $100, May 26, $200, June 9, $500, and June 12, $1,000, or a total of $4,200.

The $2,000 check was not offered in evidence and Mrs. Cook testified that it was written entirely by the plaintiff. The photostatic copies of the other checks show that each

had been filled in by Mrs. Cook, payable to her order, and signed by the plaintiff.

The checks for $2,000 and $500, respectively, were deposited by Mrs. Cook in her personal account in the Staunton National Bank, along with other funds belonging to her. She testified that they were given to her by the plaintiff for the purpose of putting a roof on the building, a fence around the entire property, and for other repairs, and that no part of this fund had been disbursed.

She said the check for $1,000, which she deposited to her personal account in the Bank of Craigsville, Virginia, had been given to her for the purpose of remodeling the house, and that all of it, except $176.26, had been expended for that purpose. An inspection of her canceled checks drawn against this latter account shows that a number of the checks were payable to herself, although she testified that they were cashed by her and the proceeds used for the purposes stated. Other canceled checks carried notations showing that they had been spent for coal, gas, oil, groceries, etc. Mrs. Cook's explanation of this was that in each instance the plaintiff had verbally authorized her to make a diversion of the funds for this particular purpose.

Mrs. Cook admitted that the remaining four checks, three for $200 each, and one for $100, were cashed by her, but testified that the proceeds were delivered to the plaintiff and expended by him for expenses in connection with certain improvements which were being made on the property at that time.

It is true that among the exhibits are three checks drawn in the summer of 1942, and all wholly in the handwriting of the plaintiff. But a casual inspection of these will convince a fair-minded person that they were written and signed only after considerable effort. Certainly, most of the checks drawn by the plaintiff at or about this time were written by Mrs. Cook and merely signed by him. There is other documentary evidence which shows that the plaintiff was unable to carry on a correspondence in his own handwriting. All

of this goes to corroborate the testimony as to his impaired eyesight.

While the deed to the Cooks appears regular on its face, it contains provisions which cannot be reconciled either with the agreed circumstances surrounding the plaintiff or with the testimony adduced in his behalf. It is conceded that the plaintiff is a man of large means, and that his nearest relatives —his niece and her mother—are also people of means. Why, then, the provision in the deed that the Cooks, his mere domestic employees, were to "care for and maintain" him "so long as he shall live and see that he is decently buried as befitting his station in life"?

Again, the deed contains a provision reserving an acre of land adjoining the church on the plaintiff's property "to be used as a cemetery and where I desire to be buried." The uncontradicted evidence is that the plaintiff had always expressed the desire to be buried in a Catholic cemetery at his old home in Wisconsin, and that arrangements had been made, at his direction, for this purpose.

■ True it is that the Cooks testified that the plaintiff freely and voluntarily executed the deed after having arranged for its preparation, and that they exercised no undue influence over, and exerted no pressure on, him. But their credibility and the truth of these statements were peculiarly for the trial court which was sitting as a jury. That it did not believe this testimony is manifest from the conclusion reached.

The argument is made that if the plaintiff was competent to execute and acknowledge the deeds conveying several pieces of property to the Haydens on July 18, 1942, he must have been competent on the previous February 28, when he executed the deed which is the subject of this litigation.

The answer to this argument is that we are not concerned with the validity or invalidity of the deeds first mentioned. Those deeds are not here involved, and we express no opinion as to whether they are valid or invalid.

■ We agree with the trial court that the facts and circumstances of the case, as proven by the plaintiff, were suf-

ficient to justify the trial court, sitting as a jury, in inferring that the execution and delivery of the deed to the defendants were not the free and voluntary acts of the plaintiff, but were the result of a fraud perpetrated upon him.

We summarize these facts and circumstances which are settled by the lower court's findings:

At or about the time of the execution and delivery of the deed the grantor was almost totally blind, was suffering from *senile dementia*, and was incapable of handling his affairs. The agreement between the grantor and the grantees, as related by the latter, under which they occupied the property, and which they say was the consideration for the conveyance, is vague, indefinite, and unlikely to have been entered into by the grantor, who had been a successful business man, and was, at the time the purported arrangement was entered into (twelve years prior to the execution of the deed), in full possession of his faculties. Therefore, there was little or no consideration for the conveyance of this valuable property. The deed itself contains provisions which are inconsistent with the circumstances surrounding the grantor's life. The disposition of the property is unnatural and is contrary to the plaintiff's expressed intention, over a long period of years, that it should go to his next of kin. The grantees are unrelated to the grantor, either by blood or marriage, and are his domestic servants, for whom he evinced no particular affection. Mrs. Cook, one of the grantees, assisted the grantor in the handling of his local financial affairs, and about the time of the execution and delivery of the deed had procured from him considerable sums of money which she mingled with her own funds. The deed was withheld from record for more than four months and was recorded by the grantees only when they ascertained that the grantor was about to convey the property to others.

In *Bibby* v. *Thomas*, 165 Va. 248, 182 S. E. 226, a deed was set aside upon the ground that it was based on an inadequate consideration and had been procured through fraud and undue influence from a grantor lacking mental capacity. The deed had been prepared and the acknowledg-

ment taken by an attorney under circumstances strikingly similar to those in the case at bar. Speaking through Mr. Justice Hudgins, we approved and applied (165 Va., at page 253, 182 S. E., at page 229) these principles laid down in *Fishburne* v. *Ferguson*, 84 Va. 87, 110, 4 S. E. 575, 581: " * * * that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside, since from these circumstances, imposition or undue influence will be inferred." The same principles apply here.

As has been said, the trial court heard the evidence *ore tenus* at the request of both sides. The hearings consumed twelve days and extended over a period of six months, during which some sixty-odd witnesses testified. After the conclusion of all the evidence counsel for the Cooks moved the court to direct an issue out of chancery and to hear the case *de novo* before a jury. The action of the court in overruling this motion is assigned as error.

There is no merit in this contention. It is too plain for argument that in consenting to a hearing of the evidence by the trial court, and in thus delaying their motion, the defendants have waived their right to a jury trial.

Over the objection of counsel for the defendants, several witnesses were permitted to testify on behalf of the plaintiff that he had made statements to them that he intended to convey the property which is the subject of this litigation to his niece and her mother. It is argued that these statements were self-serving declarations which were not admissible in evidence to corroborate his testimony.

In *Wallen* v. *Wallen*, 107 Va. 131, 157, 57 S. E. 596, this court, speaking through Judge Keith, said that such declarations were relevant to show a testator's "feelings and affections towards the natural objects of his bounty, his mental condition as reflecting upon his testamentary capacity".

See also, *Core* v. *Core*, 139 Va. 1, 7-9, 124 S. E. 453; *Forehand* v. *Sawyer*, 147 Va. 105, 121, 136 S. E. 683.

Saunders, who had prepared and taken the plaintiff's acknowledgment to the deed in controversy, testified for the defendants. On motion of the plaintiff, a portion of Saunders' testimony on direct examination was stricken on the ground that it was a privileged communication between client and attorney and could not be considered in evidence unless the privilege had been waived by the plaintiff, and that no such waiver had been shown.

This action of the trial court is vigorously assailed by the defendants, who contend that the testimony was admissible because: (1) In preparing and attending to the execution of the deed Saunders was acting as a mere scriviner and not as an attorney, and that the privilege does not apply to such a relation; (2) Even if Saunders had been acting as attorney for the plaintiff in this transaction, the rule excluding privileged communications applies merely to words spoken by the client to the witness, and not to observations which the witness had made of the client's physical and mental appearance; and (3) In any event, since Cook was present at the interview which took place between Saunders and the plaintiff, and testified as to what transpired there, this necessarily destroyed the confidential nature of the communications and removed the privilege.

Whether the defendants' first two points are well taken we need not stop to decide. There is considerable authority for and against the arguments advanced by them. However, all of the authorities agree that the defendants' third point is well taken, and that for this reason the testimony of Saunders was admissible. See Wigmore on Evidence, 3d Ed., Vol. 8, sec. 2311, pp. 601-2; 28 R. C. L., Witnesses, sec. 151, pp. 561-2.

While we are of opinion that the trial court erred in striking any of this testimony, we are further of opinion that its action in doing so was not reversible error. It clearly appears that that portion of Saunders' testimony which

was not stricken, and which was considered by the court, contains substantially the same matters to which he testified in the excluded portion. In the admitted portion of his testimony Saunders said that the plaintiff discussed and understood the provisions in the deed for the benefit of the church and the cemetery, and the fact that he (the plaintiff) had retained a life interest in the property; that he (Saunders) neither influenced nor tried to influence the plaintiff in any way, and made no suggestions to him with reference to the provisions in the deed; that the plaintiff signed the deed, without assistance, in "a steady handwriting;" that the plaintiff paid him $5.00 for his services; and that after the deed had been signed and acknowledged the plaintiff delivered it to Cook.

It necessarily follows that if the court had believed this testimony it could not have reached a conclusion adverse to the defendants.

But there were circumstances shown in the evidence, some of which we have already related, which justified the court in not believing the testimony of this witness. Moreover, there was direct evidence that his reputation for truth and veracity in the community was not good. His credibility was for the court, sitting as a jury.

It is next argued that the court erred in requiring Mrs. Cook to pay into court the balance of the unexpended funds which had been paid to her by the plaintiff for contemplated improvements on the property, and which she had deposited in her personal accounts at the two banks.

It is true that the restoration of these funds to the plaintiff was not within the scope of the pleadings. Doubtless this was due to the fact that because of his mental condition the plaintiff had no recollection of these payments, and the Cooks, in their answer, denied that he had given them any funds. These payments were disclosed during the taking of the testimony.

But according to Mrs. Cook's own testimony, neither she nor her husband has any personal interest in the funds. She was merely to disburse them for certain specific pur-

poses as agent of the plaintiff. After what has transpired we fail to see how the court could have done otherwise than terminate this agency. While technically the bill should have been amended to meet this development, the defendants did not ask that this be done, and since the money is not their property they have been in no way prejudiced by the failure to follow this course.

■ Complaint is made of the action of the trial court in permitting counsel for the plaintiff to state that they had intended to prove certain matters by witnesses who turned out not to have been available. This contention is entirely lacking in merit. The statements of counsel were merely by way of explanation to the court why these witnesses, whom counsel had previously indicated would be called, were not available. The court, of course, understood that the statements were not evidence, and there is no indication in the record that it considered them as such.

■ During the argument before us we raised the question as to whether the plaintiff, since he had conveyed the property to his niece and her mother, had a sufficient interest in the subject-matter of the suit to maintain it. But, aside from the fact that the defendants do not assert this as a defense, we are now satisfied that the plaintiff has a sufficiency of interest to maintain the suit. In 12 C. J. S., section 45, p. 1016, it is said: "However, a grantor retains sufficient interest to set aside a deed for fraud, even though after the execution of such deed he has conveyed all of his interest in the same land to a third person by warranty deed." This is based upon the principle that the plaintiff's liability on and duty to protect his warranty in the second deed supply the necessary interest. See *Collins* v. *Lindsay* (Mo.), 25 S. W. (2d) 84, and authorities there cited.

On the whole we find no error in the decree complained of and it is

*Affirmed.*