ANDREW RYDER *et al.*, Plaintiffs-Appellants, v. BANK OF HICKORY HILLS *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—88—0923

Opinion filed February 16, 1993.

Ambrose & Cushing, P.C., of Chicago (John C. Ambrose, of counsel), for appellants.

Callahan, Fitzpatrick, Lakoma & McGlynn, of Oak Lawn (William F. Fitzpatrick, of counsel), for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiffs, Andrew Ryder and his wife, Rose Marie Ryder, and Eugene Ryder and his wife, Diane Ryder, brought an action for rescission of a deed conveying title to land to defendants James and Frank Hannigan. Plaintiffs' complaint included counts against defendant Bank of Hickory Hills (Bank) in connection with the Uniform Commercial Code (UCC) sale of the collateral for a commercial loan. Plaintiffs sought an accounting for the surplus between the balance due on the collateral note and the sum paid at the UCC sale for the collateral. Additionally, plaintiffs sought a judgment against the Bank for its failure to comply with the UCC sale requirements. Following a bench trial, the circuit court found in favor of defendants. Plaintiffs appealed from that judgment. The appellate court found that the circuit court erred in refusing to find that the Bank waived its right to accelerate the loans and, accordingly, reversed and remanded the cause. The Bank appealed that decision. The supreme court reversed the appellate court and remanded the cause back to the appellate court in order to address the remaining issues which were briefed in the initial appeal.

In June 1980, Eugene Ryder obtained a commercial loan in the amount of $21,809.51 for his business, E.A. Ryder's Carpet Fashions, Inc. In order to obtain the loan, Eugene and his wife, Diane, along with Eugene's parents, Andrew and Rose Ryder, signed a note dated June 18, 1980, requiring payments totalling $36,409.20 (Commercial Note) and also signed a security agreement to secure the commercial loan. Pursuant to the security agreement, Eugene and Diane assigned their preexisting beneficial interest in their condominium residence at 9830 South Sayer, Chicago Ridge, Illinois, under land trust number

1794, which was secured by the condominium and subject to a mortgage. In addition, Andrew and Rose assigned their preexisting beneficial interest in their residence located at 3744 West 105th Street, Chicago, Illinois, under land trust number 671, which was secured by the residence.

With respect to the above collateral, the Commercial Note contained a "cross collateralization" clause, which provided that the "Bank's security interest secures all other existing and future indebtedness and obligations of debtor to Bank." At the time of execution of the security agreement, Eugene Ryder had two other loans at the Bank: a note dated January 20, 1979, for $30,000 (Mortgage Note) which was secured by a first mortgage on Eugene and Diane Ryder's condominium in Chicago Ridge and an unsecured note made on November 29, 1982, for $3,208.68 (Unsecured Note).

In the summer of 1981, Eugene and Diane Ryder entered into a contract for the sale of their condominium to John and Pamela Panos for $50,000. The terms of the contract provided that the Panoses pay Eugene and Diane $10,000 on execution of the contract with the balance to be paid in monthly installments of $310 with a balloon payment at the end of three years. On or about October 1, 1981, Eugene and Diane transferred possession of the condominium to the Panoses and moved to another residence. They did not notify the Bank of the above events.

Philip Sirotzke, the Bank's loan officer assigned to Eugene Ryder's commercial loan account, testified that the Bank learned of the condominium sale in October 1983 at a time when it had also learned that the Internal Revenue Service had issued a $17,000 tax levy against Eugene Ryder. Furthermore, Eugene Ryder, whose commercial loan was "continually past-due," had fallen four to five months behind on the loan payments. Sirotzke testified that the above circumstances caused him to feel very insecure about the Commercial Note and the other loans. On or about October 11, 1983, the Bank sent certified letters to Eugene Ryder and Andrew and Rose Ryder demanding payment in full of the Commercial Note, the Mortgage Note and the Unsecured Note. The letters were returned to the Bank marked "unclaimed."

In November 1983, Eugene Ryder and Sirotzke had a telephone conversation wherein Sirotzke informed Eugene that the Bank had accelerated the commercial loans and that "to prevent a foreclosure [the Panoses would] have to go out and get a loan right away." Subsequently, Eugene Ryder accompanied the Panoses to State Equity Company to apply for a loan with the intent to use the loan proceeds

to pay the Ryders' obligations to the Bank. The Bank deferred further action. In March 1984, the Bank was advised that State Equity had disapproved the Panoses' loan application.

On April 2, 1984, Eugene Ryder made payments to the Bank consisting of six checks totalling $3,059.10, but did not inform Sirotzke of the payments until April 13, 1984. On April 4, 1984, the Bank sent a notice of public sale of the collateral via certified mail to Eugene and Andrew Ryder. After receiving the notice, Eugene and his attorney, Tom Georgis, met with Sirotzke at the Bank on April 13, 1984, at which time they first informed him of the April 2 payments. Sirotzke agreed to continue the sale of April 19, 1984, and give Eugene Ryder an additional 30 days to "refinance or sell the condominium." Sirotzke also stated that the Bank would consider a further extension if Eugene paid the balance of the $10,000 he received from the sale of his condominium.

On April 19, 1984, Eugene paid the Bank $1,000. On May 10, 1984, the Bank sent the Ryders notices, via certified mail, of a June 1, 1984, public sale. Eugene and Diane Ryder acknowledged receipt of the notice. The certified mailed notice to Andrew Ryder was returned "unclaimed." A notice sent to Andrew by regular mail, however, was not returned. On May 30, 1984, Eugene telephoned Sirotzke and offered to pay $2,700 to call off the sale, but Sirotzke refused the offer. Prior to the June 1 public sale, a notice of public sale was published in the Southtown Economist three times from May 16 to May 27, as well as three times in the Chicago Daily Law Bulletin. Andrew Ryder claimed that he had no actual knowledge of the June 1 sale. At the sale, James and Frank Hannigan submitted the only bid. The Hannigans' $39,200 bid was accepted. The Hannigans had learned of the sale through one of the newspaper advertisements.

Plaintiffs' expert appraised the fair market value of the Andrew Ryder residence to be $84,000 and the fair market value of the condominium to be $44,500. The Ryders received no proceeds from the sale. The Ryders subsequently repurchased the Andrew Ryder residence for $43,000, at the same time they arranged a third party to purchase the condominium for $42,000.

■ Article 9 of the UCC applies to any transaction which is intended to create a security interest in personal property, including goods, documents, instruments, general intangibles, chattel paper or accounts. (Ill. Rev. Stat. 1985, ch. 26, par. 9—102(a).) In Illinois, a beneficial interest in a land trust is personal property classified as a general intangible. (Ill. Ann. Stat., ch. 26, par. 9—106, Illinois Code Comment, at 69 (Smith-Hurd 1974); *Levine v. Pascal* (1968), 94 Ill.

App. 2d 43, 236 N.E.2d 425; *Wambach v. Randall* (7th Cir. 1973), 484 F.2d 572.) In the case at bar, the cross-collateralization clause gave a security interest in the beneficial interests in the land trusts to secure two other indebtednesses, the Mortgage Note and the Unsecured Note. Article 9, therefore, applies to the transaction and security interest in the case at bar.

The proceeds from the sale of article 9 collateral must be applied to "the satisfaction of indebtedness secured by the security interest under which the disposition was made." (Ill. Rev. Stat. 1985, ch. 26, par. 9—504(b).) Thus, in the case at bar, the proceeds from the sale of the collateral were properly applied to satisfy the Commercial Note, the Mortgage Note, and the Unsecured Note.

■ Plaintiffs argue that the proceeds should not have been used to pay off the mortgage debt because the Mortgage Note gave the Ryders all their rights under the Illinois mortgage law of redemption and the 90-day cure period. (Ill. Rev. Stat. 1987, ch. 110, par. 15—1101 *et seq.*) Defendants respond that this argument confuses the mortgage with the debt secured by the mortgage. We agree that the Ryders' rights in the mortgage securing the mortgage indebtedness are irrelevant under the circumstances in the instant case because the sale involves an article 9 security interest in the debt which is separate from the mortgage securing the debt.

Although not cited by the parties, it is helpful to note an example given in the official comments to the UCC's article 9:

> "The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. [Article 9] is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, [article 9] applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage." (See Ill. Ann. Stat., ch. 26, par. 9—102(3), Uniform Commercial Code Comment 3, at 23 (Smith-Hurd 1974).)

Article 9's application should also not be affected in the circumstances present here merely because the debt is also subject to a mortgage. Under article 9, the proceeds from the UCC sale must be applied to "the satisfaction of *indebtedness* secured by the security interest under which the disposition was made." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 26, par. 9—504(b).) Since the Mortgage Note is covered by the Commercial Note's "cross collateralization" clause, the Mort-

gage Note is clearly included in the disposition of proceeds under article 9. (Ill. Rev. Stat. 1987, ch. 26, par. 9—504(b).) We find that the proceeds from the UCC sale, therefore, were properly applied to satisfy the mortgage debt.

Section 9—504(3) requires the commercial sale to be reasonable. (Ill. Rev. Stat. 1987, ch. 26, par. 9—504(3).) The circuit court's finding as to whether the sale is commercially reasonable will not be reversed unless against the manifest weight of the evidence. (*Heritage Standard Bank & Trust Co. v. Heritage Standard Bank & Trust Co.* (1986), 149 Ill. App. 3d 563, 500 N.E.2d 60; *Spillers v. First National Bank* (1980), 81 Ill. App. 3d 199, 400 N.E.2d 1057.) The circuit court found that the $39,200 realized on the forced sale was not a commercially unreasonable price even accepting the Ryders' expert appraisals that the fair market value of Andrew and Rose Ryder's home was $84,000 and the fair market value of the condominium was $44,500, for a total market value of $128,500. The circuit court, however, stated that it believed the expert's opinion as to the above values is questionable in light of the comparables utilized and the fact that the condominium and residence were subsequently repurchased in an arm's length transaction for a total price of approximately $85,000. The court found that 30½% of the expert's appraised market value did not establish commercial unreasonableness under the circumstances where there was a legitimate disinterested third-party bidder.

Section 9—507(2) of the UCC states that "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method *** is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." (Ill. Rev. Stat. 1985, ch. 26, par. 9—507(2).) Illinois courts have found commercially reasonable prices where the UCC sale realized 62% of the collateral's fair market value (*Chicago City Bank & Trust Co. v. Wilson* (1980), 86 Ill. App. 3d 452, 407 N.E.2d 964 (*rev'd on other grounds*)), where the sale realized 50% (*National Boulevard Bank v. Jackson* (1981), 92 Ill. App. 3d 928, 416 N.E.2d 358), and where the beneficial interest had a fair market value of $55,000 but sold for only $3,500 (*Horney v. Hayes* (1957), 11 Ill. 2d 178, 142 N.E.2d 94).

Based upon the above case law, we hold that the circuit court's finding was not against the manifest weight of the evidence where the sale of the collateral realized approximately 46% of the actual market value, about $85,000, which was the price paid for the properties in an arm's length transaction subsequent to the forced sale.

■ Lastly, plaintiffs contend that the circuit court erred in refusing to award Andrew and Rose Ryder damages pursuant to section 9—507(1) of the UCC (Ill. Rev. Stat. 1987, ch. 26, par. 9—507(1)) because the unclaimed notice sent to Andrew via certified mail was not in compliance with the UCC or the terms of the contract, which required the notice be sent to Andrew at a Hickory Hills address. Section 9—504(3) of the UCC requires "reasonable notification of the time and place of any public sale *** [to be] sent by the secured party to the debtor." (Ill. Rev. Stat. 1987, ch. 26, par. 9—504(3).) This section does not require proof of "actual receipt" by the debtor to satisfy the reasonable notice requirement. (*La Grange Bank & Trust Co. v. Rodriguez* (1985), 137 Ill. App. 3d 1009, 485 N.E.2d 394.) To send a reasonable notice, the notification must be deposited in the mail with postage prepaid and properly addressed. Ill. Rev. Stat. 1987, ch. 26, par. 1—201(38).

The circuit court found that the Bank complied with the UCC notice provision. The court noted that the Bank deposited in the mail, postage prepaid, the notification of the June 1 sale to Andrew and Rose Ryder. Further, the post office gave notice to Andrew of the certified mailing by the Bank, first on May 11 and again on May 18. Andrew never claimed the notice. The circuit court stated that "[i]t makes no sense that a debtor could defeat the notice merely by failing to claim mail properly sent." The Bank published the June 1 sale in the Southtown Economist for three successive weeks beginning on May 16. The circuit court also felt that Andrew and Rose had actual knowledge of the sale, even though such knowledge was denied. The circuit court found the above denial incredible. Andrew admitted that he went to his neighbor's house to look at the Southtown Economist notice of the public sale. The circuit court reasoned that the publication was for the June 1 sale because he had received notice of the April sale and, therefore, would have no reason to check on a sale about which he already knew. Finally, the court found it unbelievable that Eugene and Andrew did not speak about the June sale before it occurred. We hold that the circuit court's finding that the notice complied with the UCC is not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.