**Nora CHISOLM, et al., Plaintiffs,**

v.

**TranSOUTH FINANCIAL CORPORATION, Defendant.**

No. 2:93CV632.

United States District Court, E.D. Virginia, Norfolk Division.

May 12, 2000.

## MEMORANDUM OPINION
## AND ORDER

JACKSON, District Judge.

This matter is before the Court on Defendant's Motion to Decertify the Class Action filed on March 6, 2000, and Motion to Reject Trial Plan filed March 14, 2000. Plaintiffs' consolidated Memorandum in Opposition was received on March 24, 2000. Defendant's Amended Reply was received on April 4, 2000.[1] On April 19, 2000, the Court ordered the parties to file simultaneous supplemental briefing regarding the utilization of subclasses and the applicability of Federal Rule of Civil Procedure 53. The Court held oral argument on April 21, 2000. Having considered all memoranda and argument, the Court (1) **DENIES** Defendant's Motion to Decertify Class Action, (2) **REJECTS** the Plaintiffs' Proposed Trial Plans, (3) **ORDERS** the creation of three subclasses, and (4) **ORDERS** the submission of a new trial plan in conformity with this Opinion.

## I. Factual and Procedural History

### A. *Factual Predicate*

Broadly sketched, this case alleges that over a period of time, from at least the late 1980's until the early 1990's, the Defendant, TranSouth Financial Corporation ("TranSouth" or "Defendant"), along with Charlie Falk's Auto Wholesale, Inc. ("Charlie Falk"), and JB Collections, Inc. ("JB Collections"), conspired with one another in a "churning" scheme to defraud consumer used car purchasers. The named Plaintiffs are four individuals who purchased automobiles from Charlie Falk. The Defendant, TranSouth Financial Corporation, is a financing corporation that derived business from consumers financing automobiles purchased from Charlie Falk.

The alleged scheme began when Charlie Falk sold cars to customers, financed the purchases, and took security interests in the cars. Charlie Falk then assigned the secured notes to TranSouth. The assignments included a promise by Charlie Falk under a Repurchase Agreement to buy back the notes if the borrowers defaulted on the loans.

If a borrower missed a payment, TranSouth repossessed the vehicle and mailed a "Notice of Private Sale" to the borrower. The notice informed the borrower that the car would be sold privately if it was not redeemed. The Plaintiffs allege that these notices improperly stated the consumer's redemption rights in violation of statutory standards. When a car was not redeemed by a borrower, Charlie Falk would take possession of the note from TranSouth and TranSouth would transfer the car ownership back to Charlie Falk.[2]

Charlie Falk would then assign the note to JB Collections, which would demand payment for the deficiency. While JB Collections pursued a deficiency from the borrower, Charlie Falk would attempt to resell the car. Plaintiffs allege that the original borrowers were never informed of subsequent sales, the subsequent sales were never credited to the borrowers' deficiencies, no surplus payments were made for sale funds in excess

---

1. The parties filed two stipulations regarding the filing of responsive pleadings as to these motions. In order to permit this filing timetable, the Court granted leave on March 14, 2000, at hearing and confirmed by written Order of March 16, 2000.

2. The parties contest whether this transaction between Charlie Falk and TranSouth constituted

a sale or a repurchase under the Repurchase Agreement between the two. A "safe harbor" exists for TranSouth if the transaction occurred within the scope of a Repurchase Agreement under the Virginia Uniform Commercial Code, as discussed *infra*. *See infra* note 8.

of the deficiencies, and that some borrowers made payments towards the satisfaction of the alleged deficiency amounts.

## B. *Procedural Posture*

The complaint in this case was filed in 1993. The current complaint, the Sixth Amended Complaint, contains seven claims under which the Plaintiffs seek to impute liability to the Defendant for this churning scheme. The Sixth Amended Complaint contains four federal law claims, one claim under the Virginia Uniform Commercial Code, one claim under the Virginia Consumer Protection Act, and one claim for common law conspiracy to commit fraud.

The four federal law claims, raised under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, seek utilization of the statute's civil law provisions. In summary, they allege that the Defendant participated in and benefitted from a scheme that violated federal mail fraud laws.

On March 15, 1999, the Court granted class certification in this matter to the following class:

> All persons who purchased cars from Charlie Falk's Auto Wholesale, Inc., entered into Security Agreements with Charlie Falk's Auto Wholesale, Inc. to finance such purchases, whose loans were assigned by Charlie Falk's Auto Wholesale, Inc. to TranSouth Financial Corporation, and who defaulted on their loans and did not redeem their cars after repossession by TranSouth and/or Charlie Falk's Auto Wholesale, Inc.

*Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 567 (E.D.Va.1999). The four named Plaintiffs represent a class comprised of at least 2,500 putative class members.

The Plaintiffs have proposed three trial plans to the Court, each involving a bifurcated trial process. Two of the proposed trial plans involved the use of a special master to assist in damage calculations. The Defendant objects to the trial plans, as well as to the underlying certification of this class. The Defendant believes this case inappropriate for class action treatment. First, the Defendant argues that no trial could be conducted without violation of its Seventh Amendment right to a jury trial and due process rights under the Constitution. The Defendant additionally challenges the class certification under Federal Rule of Civil Procedure 23 and alleges that, in the earlier class certification, the Plaintiffs misled the Court as to the factual underpinnings of this case.

## II. Legal Standard

■ This Court has once before determined the question of class certification. However, the Court is duty bound to monitor its class decision and, where certification proves improvident, to decertify, subclassify, alter, or otherwise amend its class certification. *See Chisolm*, 184 F.R.D. at 567. "When, and if, the district court is convinced that the litigation cannot be managed, decertification is proper." *In re School Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir.1986). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

■ In considering the Defendant's Motion to Decertify the Class Action, this Court adheres to the legal standard required for class certification. The Court accepts as true the facts pled in the controlling complaint, here the Sixth Amended Complaint, and focuses its inquiry as to whether or not the requirements of Rule 23 are met. *See Clay v. American Tobacco Co.*, 188 F.R.D. 483, 489 (S.D.Ill.1999). "Nonetheless, the determination of a class certification motion may involve some consideration of the factual and legal issues that comprise the plaintiff's cause of action." *Id.* "The Court may not consider arguments directly on the merits, it takes into account the substantive elements of plaintiffs' claims and it looks to the proof necessary to those elements so as to envision

the form trial on those issues would take." *Id.* "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996); *accord Shelton v. Pargo, Inc.,* 582 F.2d 1298, 1312–13 (4th Cir. 1978).

Rule 23 provides, in pertinent part:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** An action may be maintained if the prerequisites of subdivision (a) are satisfied, and in addition:

 * * * * * *

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23. A proponent of class certification must meet all of the requirements of Rule 23(a) and satisfy one of the subsections of Rule 23(b). In this case, the Court in March 1999 found the class to satisfy Rule 23(a) and 23(b)(3).

■ The purpose of Rule 23 is to promote judicial economy by allowing for litigation of common questions of law and fact at one time. *See Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Rule 23 is to be interpreted liberally, tempered by the realities and peculiarities of each case to come before the Court. *See In re A.H. Robins,* 880 F.2d 709, 739 (4th Cir. 1989); *Black v. Rhone–Poulenc, Inc.,* 173 F.R.D. 156, 161 n. 5 (S.D.W.Va.1996) (noting the "liberal interpretation accorded Rule 23 in this circuit").

■ The Plaintiffs bear the burden of proving the viability of the class action and the Court performs a rigorous analysis to satisfy itself that the requirements of Rule 23 have been met. *See General Tel. Co.,* 457 U.S. at 161, 102 S.Ct. 2364. In addition to the specifications of Rule 23, certain implied requirements exist. Specifically, there must be an identifiable class and the plaintiff or plaintiffs must be members of such class. *See In re A.H. Robins,* 880 F.2d at 728. *But see* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 2.11 (3d ed.) (criticizing application of the "membership in class" element).

■ The Court, in analyzing the complaint in the context of a class action, may conclude that only certain aspects of the complaint are amenable to class certification. In the exercise of discretion, a trial court may choose to separate such claims from the other claims in the action and certify those claims only. *See* Fed.R.Civ.P. 23(c)(4); *see also In re A.H. Robins,* 880 F.2d at 728 (discussing Federal Rule of Civil Procedure 23(c)(4)). "[I]f an action 'includes multiple claims, one or more of which might qualify as a certifiable class claim, that court may separate such claims from other claims in the action and certify

them under the provisions of subsection (c)(4).'" *Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir.1993). The Court, of course, is not obligated to accept the trial plans as submitted by counsel.

■ Lastly, the Court may weigh the need for class action relief. In the context of securities litigation, the United States District Court for the Northern District of California wrote in 1972 that,

> To deny a class determination on the ground that computation of damages might render the cause unmanageable would encourage corporations to commit grand acts of fraud instead of small ones with the thought of raising the spectre of unmanageability to defeat the class action. The court does not deceive itself in believing this task will be easy, it does believe, however, that justice requires it to be attempted.

*In re Memorex Sec. Litig.*, 61 F.R.D. 88, 103 (N.D.Cal.1973). "It is proper for the court to consider the 'inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually.'" *Talbott v. GC Servs. Ltd. Partnership*, 191 F.R.D. 99, 106 (W.D.Va.2000) (quoting *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161 (7th Cir.1974)). "Understandably, if the Court were to deny class certification, many of the proposed class would more than likely neglect to file individual actions, a result which would obviously conserve judicial resources, but would do little to enhance justice." *Pruitt v. Allied Chem. Corp.*, 85 F.R.D. 100, 115 (E.D.Va.1980).

### III. Discussion

The Court first summarizes the trial plans before the Court and then summarizes the objections the Defendant raises to the trial plan and certification. Once these predicates are established, the Court will analyze the objections raised by the Defendant.

### A. *Plaintiffs' Trial Plans: The Initial Plan & Two Alternatives*

The Plaintiffs' trial plans rely extensively upon a format utilized in past class action cases involving mass torts, the "Wright–Miller–Kane" model. This model, cited approvingly in *In re A.H. Robins Co.*, 880 F.2d 709, 743 (4th Cir.1989), relies on a bifurcation of the proceeding.[3] Generally, the model calls for the resolution of class-wide issues at Phase One, with individual issues to be resolved during a later phase, frequently Phase Two. The most common issues left to Phase Two determination are questions of individual damages. In the Plaintiffs' proposed trial plans, significantly more than damages are left to Phase Two resolution.

Under the first proposed trial plan, filed with the Court on February 29, 2000, the trial would consist of two parts. Phase One would be before a jury, where class size, the

---

**3.** In the decision certifying this case for class action treatment, the Court hypothesized (1) that the concern about proving reliance by the class members could be solved through the use of affidavits, *see Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 563 (E.D.Va.1999), and (2) that a bifurcated trial structure for demonstrating individual damages would be possible. *See id.* at 566 (discussing bifurcation and mini-trials). The Court noted at that time that:

> The Court finds that reliance as a predicate to class membership may be established by proof by each Plaintiff of factors such as, but not limited to, the following: 1) each individual member received the Notice [of sale from TranSouth]; 2) in response, each allowed the automobile to be repossessed; 3) after repossession, each made deficiency payments predicated on his or her understanding that the price on which the deficiency was calculated resulted from a legitimate private sale. As such, Plaintiffs may file individual affidavits to that effect with the Court as a prerequisite to class membership. Defendant then may exercise its right to challenge an individual's membership based on its repossession records and those of JB referencing payments solicited from or made by borrowers.

*Id.* at 563. In certifying this class action, the Court identified bifurcation only as a possibility, and noted that the damage and reliance matters "may be addressed in the subject class action without bifurcating the proceedings." *Id.* at 567.

substantive claims of the Sixth Amended Complaint, the existence of class-wide damages (punitive and otherwise), and the date upon which all class members knew or should have known of the fraud, among other things, are to be determined. Phase Two calls for the Court to treble the damages if applicable, award prejudgment interest if applicable, and supervise an administrative process to award damages to the individual plaintiffs. The proposed trial plan calls for resolution of reliance questions during Phase Two as well.

Plaintiffs' Alternative Trial Plan One, filed on April 19, 2000, proposes a bifurcated proceeding, with Phase One to proceed before a jury; Phase Two before the Court or a Special Master utilizing subclasses. Broadly stated, during Phase One, the Plaintiffs propose that the jury determine the class and subclass sizes, determine class-wide damages (compensatory and punitive), resolve the named Plaintiffs' claims, and determine prejudgment interest if applicable. The jury also would be called upon to select a formula by which certain damages will be awarded to the class members. Phase Two involves four subclasses, grouped by damage types, wherein individuals will prove their membership to the subclasses in a process supervised by a Special Master. Plaintiffs, in so recommending, cite the Manual for Complex Litigation § 21.52, discussing the appointment of a master for post-trial implementation of a decree. *See Manual for Complex Litigation* § 21.52 at 112 (3d ed.1995). Appeals from the Special Master would be taken to this Court.

The Second Alternative Trial Plan contemporaneously submitted by the Plaintiffs on April 19, 2000, proposes a bifurcated proceeding as well. At Phase One, a jury would determine the named Plaintiffs' claims, the measure of damages for those due surplus damages, the measure of punitive damages for each class member, the measure of deficiency damages, and the measure of statutory damages. At Phase Two, the Plaintiffs propose that a Special Master supervise a claims process with three subclasses, the first being 408 individuals for whom the Plaintiffs believe they possess full records, the second being those demonstrating reliance, and the third being those recovering as a result of the spoilage of evidence by the Defendant. Appeals from the Special Master under the Second Alternative Trial Plan would be before this Court.

B. *Defendant's Objections to Class Certification and Plaintiffs' Proposed Trial Plans*

■ The Defendant states several reasons it believes require the class to be decertified and the trial plans rejected. The Defendant argues:

1. that the Court relied upon factual representations that subsequently proved false or different from the representations made to the Court; [4]

2. that the Plaintiffs' proposed trial plans violate the Defendant's Seventh Amendment right to a jury trial;

3. that the Plaintiffs' proposed trial plans deprive the Defendant of due process;

4. that the class fails to meet Federal Rule of Civil Procedure 23(a) requirements to permit class action certification;

5. that for the same objections identified as to the proposed trial plans, no trial plan is possible in compliance with Federal Rule of Civil Procedure 23(b); and

6. that resorting to subclassifications or Special Masters would not cure the trial plan problems or support class certification.

■ The Plaintiffs, of course, defend their trial plans as consistent with the demands imposed by law and believe this mat-

---

4. The Defendant contends that the factual basis now before the Court, as determined in depositions, varies from the factual basis the Court relied upon in March 1999. This essentially represents an attack upon the typicality of the named Plaintiffs and their ability to represent the class. The Court will address this matter under the Rule 23(a) analysis.

ter to be suited for class certification.[5] The Court next addresses the primary arguments of the Defendant.

## C. *Nexus of Individualized Issues, Bifurcation, Trial Plans, and Rule 23*

The Plaintiffs present several claims based upon federal and state statutes and Virginia common law. The trial plans submitted by the Plaintiffs each rely upon some combination of bifurcation, multiple factfinders, and the use of affidavits. The Defendant asserts that its Seventh Amendment rights are violated by the Plaintiffs' proposed trial plans.

The Defendant identifies elements of Plaintiffs' claims that the Defendant believes are inherent to the question of liability and may entail individualized inquiries. The Defendant first contends that the Plaintiffs' claims for mail fraud under RICO and the Virginia Uniform Commercial Code include the reliance of the victims as an element of the claims. The Defendant further argues that a showing of actual damages is required of each putative class member to establish liability under the Virginia Consumer Protection Act, the mail fraud-based RICO claims, the claim for common law conspiracy, and certain aspects of the Plaintiffs' Virginia Uniform Commercial Code claim. The Defendant additionally suggests that the calculation of surplus damages necessitates individualized inquiries as well. Finally, the Defendant argues that the Court will need to determine on a case-by-case basis whether under the Virginia Uniform Commercial Code and the Virginia Consumer Protection Act claims the automobile transactions involved necessarily were "consumer."

The Plaintiffs' three trial plans propose two-phases for the trial, with Phase One before a jury and Phase Two before some other factfinder, such as the Court or a Special Master. The trial plans propose to leave the resolution of individual reliance and individual damage questions to Phase Two proceedings. The Defendant argues that relegating these two issues to Phase Two, as proposed, leaves the work of the Phase One jury open to re-examination by the Phase Two factfinder. If the Defendant is correct, then liability could not be determined at Phase One, but instead must be determined at the conclusion of Phase Two.

Defendant argues that this division of the liability determinations is constitutionally infirm for Seventh Amendment and Due Process violations, and that the Court must reject the proposed trial plans. The Defendant next concludes that no trial plan is possible that would meet the requirements of Rule 23, thus the class must be decertified.

## D. *The Seventh Amendment*

The Seventh Amendment to the Constitution states that:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII, § 1. In light of Defendant's challenge, the Court must review each of the Plaintiffs' claims to determine if the claimed individualized inquiries are necessary.

### 1. Review of Claims

#### RICO Claims

█ On the RICO claims premised upon alleged mail fraud, the United States Court

---

5. The Plaintiffs argue that in the absence of changed facts or new law, the Court cannot disturb its previous class certification. In support of their argument, the Plaintiffs cite *Langley v. Coughlin*, 715 F.Supp. 522 (S.D.N.Y.1989), where that court noted that, "[a]bsent some significant intervening event, those findings may be deemed to be the law of the case." *Id.* at 552. The Court finds this argument unsupported by the requirements of Rule 23 and case law. The parameters of Rule 23 require this Court not only to receive arguments from the parties as to class decertification, but to monitor independently and evaluate the suitability of the case for class action treatment. *See Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir.1990) ("[A]n order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate."); *Kuehner v. Heckler*, 778 F.2d 152, 163 (3d Cir. 1985).

of Appeals for the Fourth Circuit requires plaintiffs to demonstrate that they "detrimentally relied in some way on the fraudulent mailing." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir.1996). The Court of Appeals further requires that the plaintiff in a civil RICO action have suffered injury to his business or property by reason of the RICO violation. *See id.* (referring to the bifurcated inquiry for civil RICO). Thus, reliance is required, as are actual damages, for Plaintiffs to succeed on any of these RICO claims. Both are elements that would require individualized inquiries.

Plaintiffs argue that the repossession of their vehicles, after they defaulted, damaged the property rights of all members of the March 1999 class. Since repossession of the vehicles was an option available to the Defendant as to all people who defaulted, the Court finds this argument unpersuasive. Merely having the automobiles repossessed does not establish damages under the RICO statute. Under RICO, damages, if proven, may flow from violation of a consumer's rights by defective notices, improperly retained surpluses, illegitimate deficiency judgments and unnecessary deficiency payments.

### Common Law Conspiracy Claim

 This Court defined Virginia common law civil conspiracy as having three elements. *See America Online, Inc. v. LCGM, Inc.*, 46 F.Supp.2d 444 (E.D.Va.1998).

> The elements necessary to establish the existence of a civil conspiracy are: (1) that two or more persons engaged in concerted action; (2) to accomplish some criminal or unlawful purpose, or some lawful purpose by some criminal and unlawful means; and (3) that actual damages resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy.

**6.** Common law fraud in Virginia sets "[t]he burden ... upon the one alleging it, and if it is not strictly and clearly proven as alleged, by circumstantial or direct evidence, no relief will be granted." *Martin v. Williams*, 194 Va. 437, 445–46, 73 S.E.2d 355 (1952). "To sustain a claim of actual fraud, the plaintiff must prove a false

*Id.* at 452 (quoting *Blackwelder v. Millman*, 522 F.2d 766 (4th Cir.1975)). Here, the conspiracy alleged is one for common law fraud.[6] Plaintiffs must establish actual damages, the third element of common law conspiracy. Under the proposed trial plans, this would necessitate individualized inquiries to ascertain which class members sustained actual damages.

### VCPA Claim

 The Virginia Consumer Protection Act claim is derived from a statute, which provides that "any person who suffers loss as a result of a violation of [the Virginia Consumer Protection Act] shall be entitled to initiate an action to recover actual damages, or $500, whichever is greater." Va.Code § 59.1–204 (Michie 1998). In this provision, the Virginia General Assembly invests in individuals "who suffer loss as a result of a violation" a right of recovery. Thus some loss as a result of the Virginia Consumer Protection Act violation is required. Additionally, to fall within the scope of the statute, the transaction must be of a consumer nature not otherwise exempted from the reach of the Virginia Consumer Protection Act. *See* Va.Code §§ 59.1–198, 59.1–199 (Michie 1998 & Supp.1999). Under the proposed trial plans, the inquiry into the nature of the good and the presence of actual damages would necessitate individualized inquiries.

The Plaintiffs rely on *Eckman v. Centennial Savings Bank*, 784 S.W.2d 672 (Tex.1990), to suggest that the consumer versus nonconsumer nature of the goods constitutes an affirmative defense that the Defendant must plead. In *Eckman*, the Texas Supreme Court interprets the "consumer" requirement under the Texas Deceptive Trade Practices Act. That act contains an escape clause, whereby the act protects only consumers with assets below $25 million. The *Eckman*

representation, of a material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage." *ITT Hartford Group v. Virginia Fin. Assocs., Inc.*, 258 Va. 193, 203, 520 S.E.2d 355 (1999).

plaintiff did not prove at trial that it possessed assets worth less than $25 million and the defendant sought a judgment as a matter of law as a result. The Texas Supreme Court rejected this reading of the statute, finding that the need to prove that the consumer fit within the exception to the statute's protections rested with the defendant. *See id.* at 674–75. "[T]he defendant has the burden to plead and prove the applicability of the $25,000,000 exception to business consumer status as an affirmative defense." *Id.* The present Plaintiffs argue this principle should be read to mean that the "non-consumer" nature of the transactions here, for the purposes of the Virginia Consumer Protection Act and the Virginia Uniform Commercial Code, should be read as affirmative defenses, with the burden resting upon Tran-South. The Court determines that it need not resolve this question, as will be discussed *infra.*

### *Virginia Uniform Commercial Code Claim*

■ Finally, under the Virginia adoption of the Uniform Commercial Code, the Defendant again asserts that the characterization of the goods is relevant to the question of statutory damages under Virginia Code § 8.9–507(1). Of course, by the very terms of the statute, the nature of the goods is not a relevant inquiry for the recovery of actual damages incurred. *See* Va.Code. § 8.9–507(1) (Michie 1991).

■ For violations of Virginia Code § 8.9–504, as have been alleged in this case, Virginia Code § 8.9–507 sets forth the methods of redress. *See In re Bush,* 166 B.R. 69, 73 (Bankr.W.D.Va.1994), *rev'd on other grounds,* 169 B.R. 34 (W.D.Va.1994). Under

§ 8.9–507, a person injured when "the secured party is not proceeding in accordance with the provisions of this part" has a "right to recover from the secured party any loss caused by the failure to comply with the provisions of this part." Va.Code § 8.9–507(1) (Michie 1991). The section continues and states that "[i]f the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the cash price or the time price differential plus ten per cent of the cash price." *Id.* Thus, for those not asserting an actual loss claim, but instead requesting recovery under the statutory minimum formula, the collateral in question must be a consumer good.

■ The Defendant maintains that a showing is required that each plaintiff relied on the misrepresentations of TranSouth for the Virginia Uniform Commercial Code claim. The Court is not convinced. An examination of the statutory remedies provision, Virginia Code § 8.9–507, does not indicate a reliance element.[7] Other states that have implemented Article 9 of the Uniform Commercial Code conclude that to recover a debtor need only demonstrate a creditor's failure to comply with the code's requirements. *See Davenport v. Chrysler Credit Corp.,* 818 S.W.2d 23 (Tenn.Ct.App.1991) ("Thus, other than proof that the secured party's conduct was inconsistent with the Uniform Commercial Code, the debtor need only prove the terms of the transaction."); *Wilmington Trust Co. v. Conner,* 415 A.2d 773, 781 (Del.1980). "[A] debtor must show that the creditor violated its duty under [Delaware law] and that the collateral is a 'consumer good' under [Delaware law]." *Wilmington Trust,* 415 A.2d at 781 (construing

---

7. The statute states in pertinent part that:
 (1) If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. *If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss*

 *caused by a failure to comply with the provisions of this part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price.*
 Va.Code § 8.9–507(1) (Michie 1991) (emphasis added).

the analogous provisions of the Delaware code under Article 9). This conclusion is supported by the language of § 8.9–507(1) itself, stating that the section is invoked when "it is established that the secured party is not proceeding in accordance with the provisions of this part...." Va.Code § 8.9–507(1) (Michie 1991).

■ The Court also notes that the Virginia Supreme Court examined Virginia Code § 8.9–504(3) in the related context of obtaining deficiency judgments. The court held the "failure to give the required notice of sale of collateral [makes] the sale commercially unreasonable." *Woodward v. Resource Bank*, 246 Va. 481, 487, 436 S.E.2d 613 (1993) (addressing the failure of a bank to give any notice prior to sale). Virginia then recognizes, once a notice is proven defective, a rebuttable presumption that "the value of the collateral equals the indebtedness secured, thereby extinguishing the debt." *Id.* at 488, 436 S.E.2d 613. Here, unlike in *Woodward*, notice was given, but allegedly it was defectively given.[8] The Virginia Supreme Court notably does not require a showing of reliance in *Woodward*.

■ The Court is persuaded that the drafters of the Uniform Commercial Code did not intend to place a burden upon debtors, but instead intended to police lenders under Article 9. *See Merchandising Nat'l Bank of Chicago v. Scanlon*, 86 Ill.App.3d 719, 41 Ill.Dec. 826, 408 N.E.2d 248, 251 (1980) ("The purpose of imposing [9–507(1) statutory minimum] civil liability upon credi-

tors is to force compliance with the protective provisions of section 9–504(3).")). In the absence of any indication from the statute and given the general predisposition of courts to read the Virginia Uniform Commercial Code liberally, *see* Va.Code § 8.1–102(1) (Michie 1991), the Court declines to adopt the Defendant's reading of the statute as to reliance. The Plaintiffs need not establish reliance to prevail on the Virginia Uniform Commercial Code claim.

■ As to the Defendant's position that each consumer must show damages to recover, the Court finds that actual damages under the Virginia Uniform Commercial Code must be demonstrated when they are claimed.[9] The Court finds however, as will be discussed *infra*, that those seeking recovery under the statutory minimum provision need not show actual damages.

■ Finally, Defendant suggests that the Court will need to ascertain whether under the Virginia Uniform Commercial Code claim each class member's automobile was used for personal or business use.[10] Under § 8.9–507(1), this is an inquiry particular to those seeking statutory minimum damages. In the context of federal consumer credit laws, courts have found a similar objection to be of no moment. "[T]he need to determine the consumer nature of a debt does not automatically preclude class certification. Instead, courts should examine the general nature of the debts and the ease of separating consumer from business debts finding class certification appropriate in a variety of circum-

---

8. Defendant contests whether it had a duty to give any notice at all, citing Virginia Code § 8.9–504(5), which provides that:

 A person who is liable to a secured party under a guaranty, indorsement, *repurchase agreement* or the like and who receives a transfer of collateral from the secured party ... has thereafter the rights and duties of the secured party. *Such transfer of collateral is not a sale or disposition of the collateral under this title.* Va.Code § 8.9–504(5) (Michie 1991) (emphasis added). If TranSouth is within the Repurchase Agreement, no sale under § 8.9–504 ever occurred and TranSouth owed no duties to the borrowers.

9. Defendant advances the notion that determining the fair market value of the automobiles is an additional individualized inquiry required to calculate damages. The Court finds the question of little moment, as there exist presumptions in the law that dictate the value of the automobiles at resale and any offset for the costs incurred by Charlie Falk in repossessing and reselling the vehicle may be ascertained from records and by reference to industry standards.

10. As noted previously, the Defendant argues that the same business versus personal use inquiry is required for the Virginia Consumer Protection Act claim.

stances." *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 598–99 (E.D.Cal.1999) (quoting *Berrios v. Sprint Corp.*, No. CV–97–0081 (CPS), 1998 WL 199842 at \*9 (E.D.N.Y. Mar. 16, 1998) (unreported opinion)). The Court does not find the distinction between personal and business purchases a bar to class certification. However, the Court does find that the current proposed trial structure would require individualized inquiries to determine actual damages where applicable, as well as a determination of the "consumer" nature of the vehicles if a plaintiff opts for statutory minimum damages.

■ The Defendant additionally notes that its affirmative defenses are inherently individual-specific, particularly in regards to any limitations defense. The Court believes this too to be a factor for consideration. Courts reject the bare assertion of limitations-based affirmative defenses as precluding class certification. *See Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 150 (E.D.Pa.1976). However, as the *Chevalier* court itself noted, reliance on equitable arguments to avoid the statute of limitations may present individualized inquiries. *See id.*

Thus, it would appear that all claims made in the Sixth Amended Complaint require some individualized inquiries to establish the Defendant's liability. The proposed trial plans would not permit an individualized inquiry before a single fact finder. The Court now turns to examine the Seventh Amendment.

2. Seventh Amendment Analysis

The Seventh Amendment cannot be read statically as only representing 18th Century English notions of the common law jury system, but instead yields necessarily to advances in United States jurisprudence, and indeed, the development of the common law. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 436 n. 20, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *see also* Patrick Woolley, *Mass Tort Litigation and The Seventh Amendment Reexamination Clause*, 83 Iowa L.Rev. 499, 504 (1998) (noting modern judicial developments such as summary judgment and post-jury verdict tests for sufficiency of the evidence).

■ The Constitution does not prohibit *per se* the bifurcation of trials, nor does it *per se* bar the use of two juries in the same action. Nor does the Seventh Amendment guarantee an absolute right to jury trial as to every aspect of a case. Courts have found in the past aggregate trials for multiple parties to comport with the Seventh Amendment, despite the absence of direct inquiry of each individual party. Such aggregation, before a jury, has been held to comply with the Seventh Amendment's jury guarantee in certain contexts. *See, e.g., Long v. Trans World Airlines*, 761 F.Supp. 1320, 1328 (N.D.Ill. 1991) (reviewing the arguments raised against aggregation in a class action and concluding that "[b]ecause it is a class action, individualized proof of damages is not mandated.").

■ The Seventh Amendment does not allow the Court to divide the proceeding such that issues decided by the initial factfinder are open to reconsideration by a different factfinder. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 628–29 (5th Cir. 1999). The Defendant maintains that the trial structures suggested in the proposed trial plans result in inherent reexamination of issues. The proposed trial plans delay litigation of damages and reliance until Phase Two, before a different factfinder than Phase One. Permitting this treatment of elements required to determine liability violates the Seventh Amendment in allowing the Phase Two factfinder to re-examine issues presented at Phase One.

Accordingly, the Court finds the Defendant's position well-taken. The viability of the proposed trial plans proceeding under these claims, where the purportedly contested individual issues abound, is doubtful. The Court cannot conceive of a trial structure with separate phases as suggested in the Plaintiffs' proposed trial plans that would be free of Seventh Amendment concerns. The

Court must, and does, reject the Plaintiffs' trial plans. This does not, however, lead to the conclusion that class certification in March 1999 or now is improper or impossible. Nor does this foreclose the possibility of a bifurcated proceeding.

The Court found *Pruitt v. Allied Chemical Corp.*, 85 F.R.D. 100 (E.D.Va.1980), helpful in resolving the issue of class certification. In *Pruitt*, the Court indicated that it would utilize a bifurcated trial proceeding, with the jury hearing part of the evidence in Phase One and recessing until Phase Two. Individualized issues that needed litigation, there damages, would be heard before a Special Master prior to submission to the jury. The Special Master would then submit a report to the jury, having been recalled, along with any other evidence for the purpose of reaching separate verdicts on damages to each class member. *Id.* at 117; *see also Burgess v. Williams*, 302 F.2d 91 (4th Cir.1962). This approach, the Court believed then and continues to believe, is consistent with the demands of the Seventh Amendment as set forth by Justice Brandeis in *In re Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920). The Supreme Court there held that the Seventh Amendment permitted a district court to retain an auditor to conduct a preliminary hearing, before whom the parties would produce evidence upon which the auditor would render an opinion as to those matters in dispute. This report would then be submitted to the jury, "with the parties still free to call, examine, and cross-examine witnesses as if the report had not been made." *Id.* at 311, 40 S.Ct. 543. The Court believes any lingering individualized issues could be appropriately addressed in this manner, including the question of affirmative defenses.

"While the [parties] clearly are entitled to a trial by jury, a report by a master will not impinge upon this right....Following submission of the master's report, which is given prima facie effect, each [party] will be afforded the opportunity to present testimony and make arguments to the jury...." *Burgess*, 302 F.2d at 94. The Court places special weight upon Justice Brandeis' observation in *In re Peterson* that "[t]he appointment of an auditor would thus serve to shorten the jury trial, by reducing the number of facts to be established by the evidence and the number of questions in controversy. A more intelligent consideration of the issues submitted to the jury for final determination would result." *In re Peterson*, 253 U.S. at 307, 40 S.Ct. 543.[11] Federal Rule of Civil Procedure 53(e)(3) directs that:

> In an action to be tried by a jury the master shall not be directed to report the evidence. The master's findings upon the issues submitted to the master are admissible as evidence of the matters found and may be read to the jury, subject to the ruling of the court upon any objections in point of law which may be made to the report.

Fed.R.Civ.P. 53(e)(3).

Federal Rule of Civil Procedure 53 states that for a district court to appoint a special master "[i]n actions to be tried by a jury, a reference shall be made only when the issues are complicated...." Fed.R.Civ.P. 53(b). Having considered the Defendant's arguments that this matter is beyond the management capacity of the Court, the Court is convinced the matter is complicated.[12] The complexity of the case is not simply in the sheer number of class members, although

---

**11.** The jury is present to decide issues of fact. Where there are no disputes of fact, the jury need not render a decision. "No one is entitled in a civil case to trial by jury, unless and except so far as there are issues of fact to be determined." *Id.* at 310, 40 S.Ct. 543; *accord In re Texas Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995); *Coleman v. Commissioner*, 791 F.2d 68, 71 (7th Cir.1986). *But see Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 666 (4th Cir.1993)

("[I]n federal court, any award of punitive damages presents a factual question that must be resolved by the jury.").

**12.** No party makes claim that this matter is not fit for invocation of Fed.R.Civ.P. 53 based upon a lack of complexity in either the briefing to the Court or oral argument. Defendant advances an argument that a Special Master under Rule 53 violates its due process and Seventh Amendment

this is a factor weighed by the Court. This is a class action, involving seven different legal theories of liability from the Plaintiffs, exculpatory theories from the Defendant, and a putative class numbering in excess of 2,500. The Court believes the multiplying effect of the theories, upon the defensive theories, upon the overall class size, results in a complicated proceeding for even the most talented of juries. *Cf. United States v. Conservation Chem. Co.,* 106 F.R.D. 210, 219 (W.D.Mo.1985) ("[T]he number of parties involved and the nature and volume of evidence to be presented are relevant to the determination of whether 'exceptional circumstances' exist within the meaning of Rule 53.' "). The churning scheme is complicated and involved multiple actors undertaking several steps. In short, the standard of Rule 53 is met in this case.[13]

■ The Court is to exercise its discretion to refer a matter to a Special Master as part of a jury trial under exceptional circumstances and with great care. The Defendant's arguments as to the enormity of the task are persuasive, only its preferred remedy of decertification is too extreme. Prior to decertification, the Court must consider all options available to render the case manageable.

Furthermore, the use of a single jury consistently throughout the proceedings to resolve all matters remains a constitutionally viable solution available to the Court. While the Court understands and recognizes the hardship of multiple-week jury service, as well as the difficulties of recessing a jury while a Special Master completes his work, jury duty remains a civic duty required by the law of citizens. The Court finds Defen-

dant's claim that the trial plans would violate its Seventh Amendment rights to be persuasive, but not insurmountable. Plaintiffs' trial plans are rejected.

### E. Due Process Violation

The Defendant maintains that the proposed trial plans constitute a deprivation of its due process rights under the Constitution. Largely this objection addresses deficiencies attendant to the proposed trial plans. The Defendant argues that the proposed trial plans' utilization of affidavits would deprive them of an opportunity to confront and cross-examine adverse witnesses. TranSouth reminds the Court of the Supreme Court's seminal statements in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), regarding the fundamental role of cross-examination in our shared jurisprudence.

The Court, having determined that the proposed trial plans suffer from flaws under the Seventh Amendment and having rejected the trial plans, declines to further explore Defendant's claim that the trial plans violate its right to due process.

### F. Rule 23(a) Analysis: The Original Class Definition

■ A Rule 23(a) analysis tests a proposed class as to four factors: (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation by the named Plaintiffs. These are not four separate, isolated factors, but instead entail a closely intertwined inquiry into the pending class. The Court first notes that the additional criteria set by the Court of Appeals in *In re A.H. Robins,* 880 F.2d 709, 728 (4th Cir.1989), must be met. There is an identifiable class

---

rights, but the Court, upon review of the case law and the plain provisions of Rule 53 is not convinced, as discussed by the Court in the body of this Memorandum Opinion and Order.

**13.** The Court's continuing need to resolve discovery disputes undermines any confidence as to future cooperation between the litigators absent judicial supervision, including invocation of a

Rule 53 Special Master. Ordinarily some matters could be resolved between the parties to winnow the issues for trial. However, here this has proven unworkable since the tenor of the exchange between counsel for the parties has reached a highwater mark for lack of civility and unwillingness to resolve matters amicably.

of individuals and the named Plaintiffs are members of that class, as defined by the Court in March 1999.[14]

The current class definition proposes a body of plaintiffs numbering in excess of 2,500. Both parties agree that this is the approximate minimum under the current class definition and little has changed in this regard since the Court's March 1999 Order. Two thousand five hundred plaintiffs remain beyond the realm of joinder and in excess of that required for a class action. The Court finds the numerosity requirement satisfied by the existing class.

 The question posed to a court examining commonality in class certification is whether there exist questions of law or fact in common such that class-wide adjudication is appropriate. See Fed.R.Civ.P. 23(a). In the present case, several common questions of law and fact exist among the class members. These stem from the alleged actions of the Defendant and alleged co-conspirators engaged in the churning scheme described in the Sixth Amended Complaint. As noted in *Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78 (N.D.Ill.1997), "[c]ourts have consistently found a common nucleus of operative facts when the defendants are alleged to have directed standardized conduct toward the putative class members, or where the class claims arise out of standard documents...." *Id.* at 82 (citations omitted). Such is the case in the present allegations. The Court finds the commonality requirement also satisfied in the existing class.

 Rule 23 also requires that a named Plaintiff's claims be typical of the claims of the putative class members. When the named plaintiffs to a class action are found to lack the typical characteristics of a class member, the United States Court of Appeals for the Seventh Circuit instructs that the suit

should not be dismissed and new class representatives named from the class. See *Walters v. Edgar*, 163 F.3d 430, 432 (7th Cir. 1998).

> This would indeed have been the proper course if something had happened to deprive the named plaintiffs of standing (or otherwise to render them inappropriate representatives of the class) after the suit had been filed, provided that two conditions were satisfied: that the suit had been certified as a class action, which would make the unnamed class members parties to the suit unless and until they opted out; and that at least one of these unnamed class members had standing.

*Id.; see also Cox v. Babcock & Wilcox Co.*, 471 F.2d 13, 16 (4th Cir.1972) (remanding case back to district court upon dismissal of named plaintiff's case to permit new class representatives to be selected from the class); *Booth v. Prince George's County*, 66 F.R.D. 466, 473 (D.Md.1975) (applying *Cox* solution to replace named Plaintiff in class action where named plaintiff had not yet suffered injury). The posture of this case closely resembles that contemplated in *Walters* and the Court finds that approach instructive. To prematurely act through decertification would be a waste of the judicial and litigant resources invested in this matter.

The Defendant argues that the named Plaintiffs are atypical for the claims they seek to prosecute on behalf of the putative class members. The Court, having examined the documentation submitted to it, agrees with the Defendant. The named Plaintiffs lack characteristics that permit them to make claims under most of the theories of liability alleged in the Sixth Amended Complaint. Specifically, the records before the Court indicate that none of the named Plaintiffs are due surplus damages and that most, if not

---

14. Presently the named Plaintiffs meet the class definition announced by the Court in March 1999. It appears from the documentation submitted in support of the Sixth Amended Complaint that each: (1) purchased cars from Charlie Falk, (2) under Security Agreements to finance their purchases, (3) whose loans were subse-

quently assigned to TranSouth, (4) who then defaulted on their loans and (5) did not redeem their cars after repossession. See *Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 567 (E.D.Va.1999). Thus, all four still meet the class as defined.

all, have not made payments towards a deficiency. While named Plaintiff Seamster claims garnishment of her wages, her name is not among those produced as part of the Plaintiffs' Expert Witness's report submitted to the Court by the Defendant as an exhibit. Accordingly, the Court finds that the named Plaintiffs do not meet the typicality requirement of the original class definition.

Defendant also challenges the ability of the named Plaintiffs to adequately represent the class overall. The Defendant argues that the named Plaintiffs "lack the ability and commitment to fund the class action litigation." Defendant's Memorandum in Support of Motion to Decertify the Class Action at 23. The named Plaintiffs, in the course of depositions, state plainly that they are not wealthy, but instead come from limited resources.

■ The test to be a class action representative has never been, nor should it ever be, a wealth test.[15] Justice does not permit such an absurd limitation on the ability of citizens to access the courts under Rule 23. Financial ability only is relevant insofar as trying to measure the overall ability of the named Plaintiffs to represent the class. A test based upon the possession of deep financial reserves doubtless would render this class without any representative. The Court does not believe that a financial capacity bright line test is consistent with the intent, purposes, or goals of Rule 23. *See Sanderson v. Winner*, 507 F.2d 477 (10th Cir.1974) (per curiam) (issuing writ of mandamus and prohibition to quash discovery granted by district court of named plaintiffs' financial background and fee agreement with class counsel; holding this to be an irrelevant inquiry and thus improper); *Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 668 n. 11 (N.D.Ala.1999) ("The amount and ex-

tent of the [named] plaintiff's finances are not determinative of his adequacy as a class representative. . . . To refuse to certify a class because the plaintiff is not wealthy enough to bear the expenses of the litigation would defeat one of the purposes of the class action device.").

■ However, the Court does examine the adequacy of the representation to date by the named Plaintiffs. The Court finds the level of representation adequate.[16] No evidence of conflict or discord within the class appears in the record before the Court, both possible indicators of problems in the representation to date. Nor does the Court detect any inadequacy in the financial resources expended or available to the Plaintiffs in furtherance of this litigation and in compliance with their duties as fiduciaries to the putative class members. "Courts typically do not examine the financial resources of the class representatives." 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.25(4)(d)(I) (3d ed.1999). The Plaintiffs here offer the fee provisions under their agreement with Plaintiffs' attorneys. The Court is satisfied that the agreement is proper in light of the litigation and has no further reason to inquire without a stronger suggestion to the Court that a problem is afoot or demonstration that the fee agreement is improper.

The Defendant argues that there are vast differences in the claims, if any, of various putative class members. As noted earlier, the question of damages is not only individualized, but also constitutes an element to be proved under many, if not all, of the pending claims. This, however, does not form a conflict, but instead suggests to the Court that it seek alternatives to decertification. "If there are any doubts about adequate representa-

---

15. Nor is the test one of legal sophistication. "To require the class representative to be sophisticated and knowledgeable enough to help counsel in this quest would reduce the class action device, especially in complicated antitrust cases, to an impotent tool." *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 146 (E.D.Pa.1976).

16. The Court observes that the voluminous pleadings, filings, and active discovery suggest that Plaintiffs' counsel adequately meet their duties under this analysis. The Plaintiffs, through counsel, are representing the class with the fervor due under Rule 23 to the absent class members.

tion or potential conflicts, they should be resolved in favor of upholding the class, subject to later reconsideration, or subclasses...." Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 7.24 at 7–82 (3d ed.1992).

### G. *Rule 23(b) Analysis*

Federal Rule of Civil Procedure 23(b)(3) permits a class action to be maintained where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The Court performs the Rule 23(b)(3) analysis, acknowledging the problems posed in typicality under Rule 23(a). As noted earlier, typicality problems are not cured immediately by decertification. *See Walters v. Edgar,* 163 F.3d 430, 432 (7th Cir.1998); *Cox v. Babcock & Wilcox Co.,* 471 F.2d 13, 16 (4th Cir.1972); *Booth v. Prince George's County,* 66 F.R.D. 466, 473 (D.Md.1975).

As the Court determined under its Rule 23(a) commonality inquiry, there exist common issues of law and fact among the putative class members. The Defendant argues that the individualized nature of the claims and affirmative defenses render this case inappropriate for class certification under Rule 23(b). The Defendant maintains that individual issues predominate in this class action because it intends to make individual inquiries as to each putative class member's reliance and/or damages, as well as the assertion of affirmative defenses. Given the size and scope of the class, in excess of 2,500, the Defendant believes this renders the class *ipso facto* unfit for class action treatment and that decertification must result.

The parties extensively address the interplay between reliance, damages, and the manageability of this litigation.[17] The Plaintiffs contend that their preferred method of management permits the Court to address both issues with little or no management difficulties because the Defendant simply will tire of making individualized inquiries. The Defendant paints an apocalyptic view, where the Defendant will inquire into the situation of each putative class member, subjecting each to cross-examination and discovery. The end result being, according to the Defendant, the case being swallowed up by an endless string of mini-trials. Even at the rate of ten plaintiffs a day, a class of 2,500 would require the better balance of a year.

The Court, as indicated before, is aware that the suggestion that a wrong is too extensive to be heard before the Court is an argument that is deeply disfavored in our society which is predicated upon the rule of law. *See In re Memorex Sec. Litig.,* 61 F.R.D. 88, 103 (N.D.Cal.1973). The instant case is not too complicated for the parties to receive equal justice before this Court.

In examining closely the parties' arguments, the Court finds that the majority of the arguments, disputes, and difficulties revolve around the management of the class. The Defendant's Motion to Decertify the Class Action identifies definite infirmities, but requests the most extreme solution. The Court finds that Rule 23 mandates a more measured remedy and will now turn its attention towards crafting an appropriate response.

### IV. Subdivision of the Class

In 1980, this Court confronted a similar scenario in *Pruitt v. Allied Chemical Corp.,* 85 F.R.D. 100 (E.D.Va.1980), a case involving damages stemming from discharges in the manufacture of Kepone into the James River. The Court, sitting in the Richmond Division, noted at the time the grave complexities facing the Court, particularly as to the need for individualized inquiries into damages. The Court there opted to utilize subclasses to resolve difficulties in management of the original proposed class action. "Rule 23(c)(4)

---

**17.** Defendant correctly notes in its Reply submission to the Court that this difficulty crystallizes upon consideration of the Plaintiffs' Trial plans. *See* Defendant's Amended Reply at 17.

requires the Court to consider employment [of subclasses] where an apparently unmanageable class action could be converted to a manageable one." *Id.* at 111. "[I]t is an extreme step to dismiss a suit simply by decertifying a class, where a 'potentially proper class' exists and can be easily created." *Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir.1984).

The infirmities the Defendant· identifies rest upon a central pillar-its alleged need to conduct individualized inquiries of the current class members. It is the nature of the claims given the size and scope of the class, in excess of 2,500, that renders this case potentially unmanageable and unsuited for class action treatment. However, in its analysis, the Court is convinced that a suitable class definition does exist. "A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.1993).

■ Accordingly, the Court sets forth a subdivided class designed to identify those individuals in the current class with claims that may be resolved through class action treatment. "Although not specifically mentioned in the rule, the definition of the class is an essential prerequisite to maintaining a class action. This determination is a question of fact that will be determined on the basis of the circumstances of each case." *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir.1976).

The Court directs the creation of three subclasses within the original class definition. The first subclass, Subclass A, consists of those who suffered repossession, were assessed a deficiency judgment, and made subsequent payments towards the deficiency judgment.[18] The second subclass, Subclass B, includes those whose cars were repossessed, were sold for a surplus, and who never received payment or credit upon the surplus. The third subclass, Subclass C, represents the balance of those encompassed by the March 1999 class definition. "Division of a class or potential class into subclasses to account for differences in proof that may be required at trial is clearly permissible." *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1129 (7th Cir.1979).

■ The Court acknowledges that "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action. A failure to do so will either require the dismissal of the action with respect to the subclass or force the action to proceed with regard to the members of the subclass on an individual basis." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir.1981). Depending on what, if any, theories the Plaintiffs prevail under, any or all of the subclasses stand to recover.[19] The Court now determines if the proposed subclasses meet Rule 23 analysis.[20]

### A. *Subclass A Class Action Certification Analysis*

The Court first determines the preliminary inquiries framed by the Court of Appeals in

---

18. Said payments being payments of any type— voluntary or involuntary. Therefore, if named Plaintiff Seamster's contention as to wage garnishment persists, she may be suitable to continue as a class representative for Subclass A.

19. The Court recognizes that persons may be members of multiple subclasses. However, at this time, the Court detects no emergent conflict under those circumstances and no risk of unjust enrichment to any prevailing plaintiff. This is consistent with this Court's earlier position regarding cross-over of subclass members. In *Pruitt v. Allied Chemical Corp.*, 85 F.R.D. 100 (E.D.Va.1980), this Court divided a class into six subclasses. In doing so, the Court noted that "cross-overs do not ... preclude certification of

the individual subclasses, as those plaintiffs belonging to more than one subclass may be represented in more than one ... or may opt out of however many subclasses they choose." *Id.* at 112–13.

20. The Defendant states that its assertion of affirmative defenses will also serve as another point of required individualized inquiry as to each class member. The Court is not convinced this is necessarily so and notes that neither party fully addresses this question in the briefing to the Court. The Court believes this to be solvable under a well-crafted trial plan.

*In re A.H. Robins,* 880 F.2d 709, 728 (4th Cir.1989). The proposed Subclass A exists and its members are identifiable. As to whether any of the named Plaintiffs are members of Subclass A, it would appear from the record before the Court that none of the named Plaintiffs meet the subclass criteria.[21] However, as discussed earlier, the Court is not persuaded that the failure of named Plaintiffs to meet the subclass definition is fatal. *See Walters v. Edgar,* 163 F.3d 430, 432 (7th Cir.1998); *Cox v. Babcock & Wilcox Co.,* 471 F.2d 13, 16 (4th Cir.1972); *Booth v. Prince George's County,* 66 F.R.D. 466, 473 (D.Md.1975). The Court will allow time for the identification of new named Plaintiffs or for the submission of any additional evidence to demonstrate the ability of a named Plaintiff to continue the prosecution of this action.[22]

The Court gleans from the pleadings roughly ninety-nine individuals comprising Subclass A.[23] This is in excess of that required for class action treatment, so the Court finds that Subclass A meets the numerosity threshold requirement. Joinder of these subclass members would be difficult to effectuate.

The individuals comprising Subclass A may show that they suffered as a result of the scheme allegedly perpetrated by the Defendant and others. The Court finds the churning scheme is one predicated upon standardized behavior directed at all of the subclass members. Where standardized conduct is directed uniformly to all of the subclass members, the courts look favorably upon class action treatment. *See Peterson v. H & R Block Tax Servs., Inc.,* 174 F.R.D. 78 (N.D.Ill.1997).

As there are no named Plaintiffs to represent Subclass A at this time, the Court need not pass on the typicality of the representative's claims, nor on the appropriateness of their representation of the putative class members. The Court will assess whether the proposed representatives' claims are typical of Subclass A and if they are appropriate subclass representatives.

Finally, the Court deems Subclass A to meet the superiority requirement of Rule 23(b)(3). Class action treatment of the subclass's claims would be an efficient and effective use of the Court's time and resources. The claims stem from a common, uniform scheme about which a single presentment of evidence would be best. The Court finds that Subclass A does not suffer from the need for individualized inquiries that doom the March 1999 class definition for the reasons stated herein.

### *Subclass A: Certification Analysis–Reliance*

In *Spark v. MBNA Corp.,* 178 F.R.D. 431 (D.Del.1998), the District Court for the District of Delaware certified a class action alleging that a bank violated RICO while making misleading statements in credit card advertisements. The RICO claim cited a scheme to defraud within the meaning of the federal mail and wire fraud statutes, as well as a breach of contract claim and a claim under the Delaware Unfair and Deceptive Practices Act. The bank, MBNA, argued that the claims in the complaint could only be supported by a finding that each class member relied upon the disputed advertisements, presenting a situation where individual questions would "overwhelm" the common questions. *See id.* at 435. The District Court relied on the decision in *Eisenberg v. Gagnon,* 766 F.2d 770 (3d Cir.1985), stating

**21.** Plaintiff Seamster states in her deposition that wages were garnished towards the deficiency judgment. If this is her position, then she may be qualified to continue representation.

**22.** The Court detects no harm to the subclass in the representation to date by the current named Plaintiffs. "To the extent inadequacy is based solely upon lack of sufficient identity of interest, any presumed adverse effect on the merits stemming from this may in fact be utterly belied by

the outcome...." *Hill v. Western Elec. Co.,* 672 F.2d 381, 389 (4th Cir.1982).

**23.** In Defendant's Amended Reply, it notes a decrease in the Plaintiffs' estimated number of class members making deficiency payments. The smaller number, between fifty and sixty, remains sufficient to maintain a class action. The Court utilizes the higher count of ninety-nine to prevent an overly optimistic assessment of the manageability of this subclass.

that the "presence of individual questions as to reliance of each [plaintiff] does not mean that the common questions of law and fact do not predominate over questions affecting individual members as required by Rule 23(b)(3)." *Id.* at 786.

■ As discussed earlier, under the RICO claims the Plaintiffs must demonstrate that they "detrimentally relied in some way on the fraudulent mailing." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir.1996). Subclass A meets this requirement by inherently incorporating within it a showing of detrimental reliance: the deficiency payments themselves. *Cf. Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 149 (E.D.Pa.1976) ("In the instant case, the payment of the alleged excess interest charge would be sufficient to satisfy the [Sherman Act] impact requirement. Since, by definition all members of the class have made such a payment, there are no individual questions involved in this aspect of the claim.").

■ Presumed reliance[24] under civil RICO is generally disfavored outside of certain narrow contexts. The Supreme Court applies presumed reliance, under the fraud-on-the-market theory, in the securities litiga-tion context. *See Basic Inc. v. Levinson*, 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (recognizing a rebuttable presumption of reliance in Rule 10b-5). However, "the rationale for the theory—the plaintiff's reliance on the integrity of the open securities market—does not easily extend to general fraud claims." Terrance G. Reed & David B. Smith, *Civil Rico* at ¶ 6.05, 6–139 (1999). Instances where this presumption is afforded to other contexts include credit card schemes,[25] consumer loans,[26] prescription drug pricing,[27] breach of commission contract claims,[28] and Truth in Lending Act actions.[29] Having considered several other instances of this presumption at work, the Court believes the members of Subclass A to fit within this narrow presumption given their particular facts.

The United States District Court in *Sparks* stated that "the court may presume reliance 'where it is logical to do so.'" *Spark*, 178 F.R.D. at 435 (quoting *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir.1981)). The court then concluded that,

[I]t is fair to assume that most individuals who opened up credit card accounts after receiving the offer from MBNA did so because the advertisement, and specifically

24. This is not so much a showing of presumed reliance as it is a showing of demonstrated reliance via circumstantial proof. The Court notes that common law fraud in Virginia sets "[t]he burden ... upon the one alleging it, and if it is not strictly and clearly proven as alleged, by circumstantial or direct evidence, no relief will be granted." *Martin v. Williams*, 194 Va. 437, 445–46, 73 S.E.2d 355 (1952). Fraud cannot be presumed, but reliance may be demonstrated by circumstantial or direct evidence. Indeed, "[c]ircumstantial evidence is not only sufficient, but in most cases is the only proof that can be adduced." *Cook v. Hayden*, 183 Va. 203, 209, 31 S.E.2d 625 (1944). "Moreover, 'A transaction may of itself and by itself furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendant and even the evidence of witnesses.'" *Id.* (quoting *Todd v. Sykes*, 97 Va. 143, 147, 33 S.E. 517 (1899)).

25. *Spark v. MBNA Corp.*, 178 F.R.D. 431 (D.Del. 1998).

26. *Cannon v. Nationwide Acceptance Corp.*, No. 96C1136, 1997 WL 779086 (N.D.Ill.Dec. 12, 1997). Although the district court concluded that "[i]ndividualized reliance need not be shown for claims brought under RICO and the Illinois Consumer Fraud Act," *id.* at *3, the court went on the state, "reliance can be inferred from the fact that the alleged loan flipping scheme was built on standardized forms and conduct and the class members refinanced their loans despite the fact that it was a poor financial decision." *Id.*

27. *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330 (N.D.Ill.1997).

28. *Smith v. MCI Telecomm. Corp.*, 124 F.R.D. 665 (D.Kan.1989).

29. *Van Vels v. Premier Athletic Ctr. of Plainfield, Inc.*, 182 F.R.D. 500 (W.D.Mich.1998). The trial court concluded that TILA actions are amenable to class treatment. However, the same decision declined to certify the common law fraud claims on the basis that Michigan case law and Sixth Circuit case law concluded definitively that common law fraud was not amenable ever to class treatment because of the question of individual reliance.

because of the low APR.... Thus, the court finds that it is 'logical' to presume reliance in this case, and therefore that common questions of law and fact predominate over individual ones in this case.

*Id.* at 436. This logic of self-proving reliance applies with equal force to the claims of Subclass A members.

In *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 338 (N.D.Ill.1997), the district court, recognizing a RICO requirement that the "scheme proximately caused injury to the plaintiff," reached the same conclusion and applied this self-proving rationale. Addressing the mail fraud claims under RICO in the context of prescription pricing, the district court noted that "[c]ourts have adopted two different approaches to the reliance requirement in RICO class action suits based on fraud." *Id.* The court continued and stated, "[w]hen the fraud is perpetrated in a uniform manner against every member of the class, such as when all plaintiffs received virtually identical written materials from the defendants, courts typically hold that individual reliance questions do not predominate." *Id.*

> In this case, the proposed class would only include persons who signed the Manor Care contract and who also received specific written statements regarding pricing at Vitalink pharmacies.... In cases like this one, where the common documents include a contract to which every plaintiff is a signatory, it is particularly sensible to view reliance questions as secondary: by definition, parties to a contract are aware of and rely on the representations or omissions in the contract.

*Id.* at 338–39.

In *Peterson v. H & R Block Tax Servs., Inc.,* 174 F.R.D. 78 (N.D.Ill.1997), another district court found similarly in a class action regarding H & R Block's rapid refund/loan program. The *Peterson* court first noted that "courts will presume class members' reliance when it is logical to do so or when the complaint's allegations make reliance ap-

parent." *Id.* at 84–85. The *Peterson* court determined that where class members were induced to pay a fee for a service they were ineligible for (rapid tax refunds), the "only logical explanation for such behavior is that the class members relied on the RAL Fact Sheet's representations that they could take advantage of RAL by paying the requisite fee." *Id.* at 85.

Finally, in *Smith v. MCI Telecomm. Corp.,* 124 F.R.D. 665 (D.Kan.1989), the district court concluded that where RICO fraud claims were made on the basis of written documents (plans and addenda provided to employees), "the basic misrepresentation giving rise to the fraud claim is uniform." *Id.* at 678. The district court then accepted the plaintiff's argument that reliance upon the documents (setting forth the alleged misrepresentation) was demonstrated by the fact that the employees entered into employment after receiving the documents. *Id.* at 679. "It is implausible that, in initiating or continuing their employment with MCI, the salespersons did not rely on the commissions plans which they were required to sign. Further, whether their reliance was reasonable is an objective inquiry common to the entire proposed class." *Id.*

In the case at bar, the Court faces a scheme premised upon standardized forms and even the use of the process of the courts. It is difficult to conceive how those who made payments on the deficiency judgments could be found to have not relied. Those individuals clearly made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were taken in conformity with the law and that their rights were protected. To conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion.

In examination of the claims raised by the Sixth Amended Complaint, the Court be-

lieves that the reliance element [30] is no longer an individualized inquiry that will render this matter inappropriate for class action treatment. Instead, the Court finds reliance to be self-proving as to these class members who meet the subclass definition.

This is consistent with the Court's previous statement in the March 1999 certification order that "[d]eterminations of whether putative class members meet the reliance requirement ... may logically preexist trial on a civil RICO fraud action." *Id.* The Court then stated:

> [R]eliance as a predicate to class membership may be established by proof by each Plaintiff of factors such as, but not limited to, the following: 1) each individual member received the Notice; 2) in response, each allowed the automobile to be repossessed; 3) after repossession, each made deficiency payments predicated on his or her understanding that the price on which the deficiency was calculated resulted from a legitimate private sale.... Plaintiffs may file individual affidavits to that effect as a prerequisite to class membership. Defendant may then exercise its right to challenge an individual's membership based on its repossession records and those of JB referencing payments solicited from or made by borrowers.

*Id.* The Court's adoption of Subclass A integrates this portion of the certification decision into the subclass definition. Furthermore, the Defendant advances the same logic to the Court in the most recent briefings. "Plaintiffs could argue that making payments to TranSouth or to Falk after receipt of the notice of private sale would indicate detrimental reliance on the notice's statement that Plaintiffs could redeem their automobiles, as would permitting the cars to be repossessed." Defendant's Brief in Support of Motion to Decertify the Class Action at 17.

Of course, Defendant advocates a view of reliance contrary to that expressed by the United States Court of Appeals for the Fourth Circuit and this Court in this case. The appellate court noted that, "[i]n order for the scheme to succeed, the appellants needed to be convinced that the 'private sales' referenced in the TranSouth notices were legitimate. Had an appellant's suspicion been aroused, she might have inquired further or—worse—retained a lawyer to investigate the matter." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 338 (4th Cir. 1998). This inducement into unquestioning acquiescence is the reliance at issue.

Plaintiffs' theory is that "Defendant did not mail the notices to prevent defaulting borrowers from exercising their redemption rights, but instead to assure them that the liquidation was proceeding legally and legitimately." *Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 563 (E.D.Va.1999). The Court has consistently held this view of the reliance issue, even at the initial stages of this litigation.

> Plaintiffs' "reliance" argument amounts to no more than a general complaint that TranSouth participated in a massive fraud, an illegal and profitable scam, that took advantage of the innocent plaintiffs' reliance on the apparent legitimacy and legality of the operation.

*Chisolm v. Transouth Fin. Corp.*, 851 F.Supp. 739, 757 (E.D.Va.1994), *vacated and remanded*, 95 F.3d 331 (4th Cir.1996).

The Defendant directs the Court's attention to the case of *Caviness v. DeRand Resources Corp.*, 983 F.2d 1295 (4th Cir.1993). In *Caviness* the appellate court examined the efforts of seventeen plaintiffs to allege a RICO claim stemming from alleged securities fraud in their oil and gas partnerships. The Court believes *Caviness* to be instructive on the careful analysis required for inferred reliance under RICO claims predicated upon mail fraud. In that case, the appellate court noted the extensive evidence from the record

---

**30.** As previously discussed, the Court is not convinced that reliance is a necessary requirement of the Virginia Uniform Commercial Code claims if the Defendant is found to be outside the statutory safe harbor it seeks to use. *See supra* note 8. However, reliance could be demonstrated this way as well as to that claim.

that undermined any claim of reliance by the plaintiffs. *See id.* at 1305. However, the facts of this case are different.

First, the sophistication of the plaintiffs clearly is different. In *Caviness* the plaintiffs were comprised "for the most part, [of] accountants and lawyers in the Washington, D.C. area who invested in [the partnership] projects primarily for tax reasons." *Id.* at 1298. Here, the plaintiffs clearly are individuals of little legal or financial acumen. In *Caviness* the plaintiffs claimed reliance upon misleading statements from the defendants as to the financial position of the partnership and its investments. In the case at bar, the members of Subclass A performed duties they believed were imposed upon them as a result of proceedings that had been conducted in conformity with the law. Unlike the *Caviness* financial statements, the TranSouth notices presented the inherent threat of further legal process to collect debts. Further, it may be concluded that the deficiency judgments caused consumers to acquiesce to the churning scheme. Finally, *Caviness* was not a case seeking to proceed under Rule 23. As other courts discussed and this Court noted earlier, special concerns are raised under Rule 23 that must also be weighed.

Often reliance is a matter that is demonstrated inferentially and by circumstantial proof. *Cf. Cook v. Hayden,* 183 Va. 203, 209, 31 S.E.2d 625 (1944) (holding in analyzing reliance under common law fraud that "[c]ircumstantial evidence is not only sufficient, but in most cases is the only proof that can be adduced."). The proof of reliance in the instant case may be direct as well as inferential and circumstantial.

*Subclass A: Certification Analysis—Damages*

The United States Court of Appeals for the First Circuit in *Aetna Casualty Surety Co. v. P & B Autobody,* 43 F.3d 1546 (1st Cir.1994), observed that a party may not enjoy a Seventh Amendment right to jury trial on damage calculations where such calculations may be made "as a matter of law." *Id.* at 1567. Where "reasonable factfinders applying the correct legal standard could come to but one determination as to the amount of damages to be awarded under the jury's findings on liability," no jury rights attach at that stage. *Id.*

The actual damages sustained by Subclass A members readily are identifiable as a matter of course on the basis of the records now possessed by the parties. All damages here are monetary and can be awarded as a matter of law if the Plaintiffs prevail upon any theory, whether in actual damages sustained or redounding in the statutory minimum recovery for "consumer goods." [31]

If the Court finds that issues of fact do exist in the calculation of damages to those making deficiency payments, the Court believes they will be of a minimal nature that may be resolved through a well-crafted trial plan.[32]

### B. *Subclass B Class Action Certification Analysis*

Subclass B similarly meets the requirements of this judicial circuit and Rule 23 as to class action certification. Preliminarily, the *In re A.H. Robins* factors are sufficiently met. *See In re A.H. Robins,* 880 F.2d 709,

---

31. However, the Court observes that the commentary to Virginia Code § 8.9–507 states the consumer goods statutory provision as a "minimum recovery." Va.Code § 8.9–507 (Michie 1991) cmt. 1.

32. In supplemental briefing to the Court and oral argument, the Defendant raises a new "individualized inquiry" issue. Defendant now suggests that the "fair market value" of the vehicles is affected by the condition of each vehicle, a determination that would require individualized inqui-

ries into each car repossessed. The Court considers the proffer to the Court of the existence of industry standards upon which such values are calculated and notes further a presumption that the resale value is the value of the collateral in the context of automobile repossessions under Virginia law. "[W]e hold that if the secured party fails to give notice of the sale of collateral as required by Code § 8.9–504(3), then a rebuttable presumption arises that the value of the collateral equals the indebtedness secured...." *Woodward v. Resource Bank,* 246 Va. 481, 488, 436 S.E.2d 613 (1993).

728 (4th Cir.1989). The class members themselves are identifiable and suitable representative named Plaintiffs can be identified to the Court to permit this action to proceed in the event a named Plaintiff does not meet this subclass's eventual definition.

The Court finds that exhibits submitted to the Court reflect some 442 instances where the subject automobiles were re-sold in subsequent sales for values in excess of the outstanding debts.[33] Accordingly, the Court believes that numerosity as to Subclass B is met. Joinder of litigants in excess of four hundred presents an impractical and inefficient method of adjudicating this controversy given the nature of the injuries and the scheme alleged.

The churning scheme alleged is one predicated upon written statements and documentation presented in a standardized fashion to all of the purported victims. For the reasons stated earlier in the Subclass A commonality analysis, the Court finds there to be common questions of fact and law between the members of Subclass B stemming from the uniform nature of the purported churning scheme so as to support class action treatment.

Similar to Subclass A, at this time there are no named Plaintiffs to apply the Rule 23 tests of typicality and adequacy. The Court, upon submission of appropriate names, will ensure that these requirements are met.

■ The Court finds that Subclass B, as contemplated, meets the requirements of Rule 23(b)(3) as well, whereby the "questions of law or fact common to the members of the [subclass] predominate over any questions affecting only individual members." Fed. R.Civ.P. 23(b)(3). As with the members of Subclass A, the same logic applies. The members of Subclass B received standardized documents and correspondence as part of an alleged scheme to defraud the subclass members. Where schemes are predicated on standardized frauds, especially frauds predicated upon documents, these are found traditionally to be suitable for class action treatment. *See Peterson v. H & R Block Tax Servs., Inc.,* 174 F.R.D. 78, 82 (N.D.Ill. 1997).[34]

Subclass B similarly avoids the reliance and damages problems that plague the original class definition for much the same reasons as the Court finds Subclass A avoids those problems. Thus, Rule 23(b)(3) is satisfied by Subclass B. The subclass members all claim the Defendant liable under theories based upon the same set of facts surrounding the purported churning scheme.

### Subclass B Certification Analysis—Reliance

■ Reliance is required to maintain the RICO claim. For the members of Subclass B, the Court finds that the indicia of self-proving reliance is the failure of these plaintiffs to seek funds due to them under the Virginia Uniform Commercial Code. Only one conclusion could be drawn from the failure to collect the funds rightfully due—a belief that their interests were properly protected as required by the law.[35] It is in-

---

**33.** In Defendant's Amended Reply, it notes a decrease in the Plaintiffs' estimated number of class members owed surplus damages. The smaller number, slightly over 400, remains sufficient to maintain a class action. The Court utilizes the higher count to prevent an overly optimistic assessment of the manageability of this subclass.

**34.** Particular to the Virginia Uniform Commercial Code claim, the Court is aware of and has reviewed the decision cited by the Defendant by the New Mexico Court of Appeals, *Ridley v. First National Bank of Albuquerque,* 87 N.M. 184, 531 P.2d 607 (1975). There the court rejected class certification under the analogous New Mexico Commercial Code provisions. However, there the plaintiffs alleged failures as to the date of receipt of notice and the related question of minimum time required for redemption. Here, the inquiry focuses instead upon standardized language contained in form letters. Thus, *Ridley* is not applicable to these circumstances.

**35.** As previously discussed as to the Virginia Uniform Commercial Code claim, the Court is not convinced that reliance is a necessary requirement if the Defendant is found to be outside the statutory safe harbor it seeks to rely on. *See supra* note 8.

conceivable that individuals under these circumstances, where their vehicles were repossessed, would not seek recovery of funds due to them, unless lulled into complacency. As discussed extensively for Subclass A, the Court believes reliance not to be an issue that would render this subclass unmanageable as a class.

### Subclass B Certification Analysis— Damages

The Virginia Uniform Commercial Code mandates that in the event that a creditor is able to sell the collateral in excess of the debt owed, the "surplus" created is to refunded to the debtor. *See* Va.Code. § 8.9–504(c)(2) (Michie 1991). The case before the Court requires further analysis, however, as the Defendant argues strenuously that it fulfilled its obligations pursuant to Virginia Code § 8.9–504(5) and falls within the statutory safe harbor created there. If correct, the Defendant did not stand as the creditor at the time of the resale creating the surplus. The success of this argument, however, only avoids the Virginia Uniform Commercial Code claim alleged in the Sixth Amended Complaint. A finding against the Defendant as to any of the conspiracy claims (those premised upon RICO and common law conspiracy), could leave the Defendant liable for the failure of Charlie Falk to account for the surpluses under the more general guise of damages.

The damages argued here are of a type determinable from the financial records of the parties and may be entered as a matter of law upon the requisite determination of liability of the Defendant. The Court, therefore, believes there to be little difficulty in addressing the damages inquiry that handicapped the original class definition.

### C. Subclass C Class Action Certification Analysis

The Court further creates a Subclass C, comprised essentially of those who received the disputed notice from TranSouth.[36] As to a majority of the Sixth Amended Complaint claims, the Court finds individual aspects to overwhelm the subclass's common questions and the Court will not certify those claims as to this subclass.[37]

However, as to the Virginia Uniform Commercial Code claim, the Court believes that Subclass C remains amenable to class action treatment. Close study of the Virginia Code demonstrates to the Court's satisfaction that the contested issues that threaten to overwhelm the other claims are not present in this claim. The Court finds that Subclass C meets the requirements of Rule 23 as to the Virginia Uniform Commercial Code claim and will certify it as to that claim only. "[I]f an action 'includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4).'" *See Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir.1993).

First, the Court concludes that there exists an identifiable class and further concludes that the named Plaintiffs may continue in

---

**36.** Defendant argues in its briefing to the Court that there are class members whose vehicles were never repossessed. Having examined the class definition set forth in March 1999, the Court finds such individuals barred by the existing class definition. The final sentence of the class definition reads, in part, "who defaulted on their loans and did not redeem their cars *after repossession by TranSouth and/or Charlie Falk's Auto Wholesale, Inc.*" *Chisolm*, 184 F.R.D. 556, 567 (E.D.Va.1999) (emphasis added).

**37.** As to the RICO claims, the Court finds that no self-proving indicia of reliance can be discerned from the Subclass C members, nor any common means of measuring damages. The Virginia Consumer Protection Act invests a right of action in those who suffer a loss as a result of a violation, thus the claim is not feasibly maintained as a class action for Subclass C for the same inability to determine a common means of measuring damages. Lastly, the common law conspiracy claims also require actual injury from the conspiracy. That again cannot be ascertained from these subclass members in the absence of individualized inquiry.

representation of Subclass C. This fulfills the requirement that "there be an identifiable class and that the plaintiff or plaintiffs may be a member of such class." *In re A.H. Robins*, 880 F.2d 709, 728 (4th Cir.1989). The named Plaintiffs all received the notice in question from TranSouth, thus rendering them part of Subclass C. These matters settled, the Court turns to the Rule 23 analysis.

Comprising the balance of the 2,500 class members, the Court is certain that numerosity under Rule 23 is met and exceeded by Subclass C. As for the commonality of the subclass, given the narrow certification of only the claim for statutory minimum damages under the Virginia Uniform Commercial Code, it is obvious to the Court that standardized behavior, the form letters sent by TranSouth, meet the *Peterson* inquiry for standardized conduct directed uniformly to all of the subclass members. *See Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 82 (N.D.Ill.1997).

As for the typicality and appropriateness of the named Plaintiffs, the named Plaintiffs are suitable to represent Subclass C having all received the disputed notice from Tran-South, conferring standing to recover if successful on the Virginia Uniform Commercial Code claim. As discussed previously, the Court finds no substantive basis to further delve into the adequacy of their representation to date, this case having been fully prosecuted for over six years at this time by the named Plaintiffs. Nor is there reason in the record to question their prospective ability to represent the subclass.

Under the rubric of Rule 23(b)(3), the Court now looks at the three areas of challenge that the Defendant raises under the banner of manageability: (1) nature of the good, (2) reliance, and (3) damages. The Court believes that none present a problem under this claim. Given the common scheme and the absence of the need for extensive individual inquiry, the Court believes Rule 23(b)(3) to be met by Subclass C.

### *Subclass C Certification Analysis—Nature of the Transaction/Good*

The Defendant asserts that as a threshold matter, it will demand to ascertain whether the automobiles Charlie Falk sold to individuals represent the sale of "consumer goods" within the meaning of Title 8.9 of the Virginia Code. Section 8.9–109(1) defines goods as consumer goods "if they are used or bought for use primarily for personal, family or household purposes." Va.Code § 8.9–109(1) (Michie 1991).[38] In support of this argument against certification, the Defendant directs the Court's attention towards the deposition testimony of named Plaintiff Richards. In her deposition, Richards states that she used the automobile purchased from Charlie Falk for her housecleaning business. *See* Defendant's Amended Reply at 12–13 (quoting Richards' Deposition at 12–13).[39]

The Defendant cites a 1978 Texas appellate court case, where the court placed the burden of demonstrating the nature of the goods upon the party seeking to recover statutory damages. *See Bundrick v. First Nat'l Bank of Jacksonville*, 570 S.W.2d 12, 19 (Tex.Civ.App.1978). Even assuming that the burden rests with the Plaintiffs, this does not resolve the question of whether the matter is suitable for class action adjudication. Indi-

---

**38.** Apparently no contest is made as to whether automobiles themselves constitute goods. Goods are "all things which are movable at the time the security interest attaches...." *In re Rex Group, Inc.*, 80 B.R. 774, 781 n. 17 (Bankr.E.D.Va. 1987).

**39.** The Defendant further argues that the burden of demonstrating that the automobiles were consumer goods rests with the Plaintiffs, citing *Bundrick v. First National Bank of Jacksonville*, 570 S.W.2d 12, 19 (Tex.Civ.App.1978), and *Wilmington v. Conner*, 415 A.2d 773, 781 (Del.1980). The

Court finds the citation to *Wilmington* unhelpful, as the Court reads the case as stating that the burden of presenting relevant trial transcripts in support of an appeal rests with the party making the appeal. *See Wilmington*, 415 A.2d at 781 ("Whether the full record in this case would have borne out the plaintiff's contentions, we cannot say. The plaintiff had the burden of producing the portions of the record relevant to its contentions on appeal...."). Furthermore, in *Wilmington*, the plaintiff was the secured creditor, bringing suit against the debtor.

vidualized inquiries as to Subclass C in open court would overwhelm the Court if all 2,500 putative class members were called to testify. However, the Court does not find such a sweeping scope of inquiry to be required.

■ The Court possesses the inherent authority under the Federal Rules of Evidence to take judicial notice of such facts that are "generally known within the territorial jurisdiction of the trial court." Fed.R.Evid. 201(b). The Court observes that Charlie Falk Auto Wholesale is a widely advertised, multi-location establishment well-known for its "bad credit, no credit" policies and credit-report-eating-goat advertisement. The Court finds that it generally is known in this jurisdiction that Charlie Falk is in the business of selling used automobiles to consumers for their personal use. *Cf. Wella Corp. v. California Concept Corp.*, 558 .F.2d 1019, 1022 (C.C.P.A.1977) (taking judicial notice that home cold permanent wave kits were sold directly to nonprofessional consumers through retail outlets), *see also Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1166 (7th Cir.1974) (noting that where there is no indication of more than minimal commercial purchases at a retail furniture store, the assertion by defendant that ascertaining the consumer/commercial nature of a transaction will not be held to overwhelm a class action by consumers under the Truth in Lending Act). While not expressly making this judicial determination at this time, the Court does not believe the question of whether automobiles sold from Charlie Falk's Auto Wholesale were consumer goods or something else to be a dispute of any moment.[40]

The United States District Court for the Northern District of Illinois examined a similar argument raised in the case of *Beasley v. Blatt*, No. 93C4978, 1994 WL 362185 (N.D.Ill. July 11, 1994) (unpublished opinion). There, the district court certified a class of plaintiffs asserting unfair debt collection practices by the defendants in automobile lease debt collections. Specifically, the plaintiffs sought to impute liability under the Fair Debt Collections Act premised upon collection letters the plaintiffs alleged violated the statute. The defendants argued that the statute's requirement that a debt be consumer, as opposed to business, precluded class certification. That district court was not persuaded, and neither is this one. If it should emerge as a problem not resolvable through judicial notice, the Court will merely direct that an appropriate trial plan be made to obtain rational conclusions as to the nature of the vehicles involved. *See, e.g., Pruitt v. Allied Chem. Corp.*, 85 F.R.D. 100, 117 (E.D.Va.1980).

### Subclass C Certification Analysis—Reliance

The Court's prior analysis on the question of reliance controls here as well. Reliance under Virginia Code § 8.9–507 need not be demonstrated or even alleged to recover. A party seeking recovery pursuant to § 8.9–507 need only establish that the secured party failed to proceed in accordance with the applicable provisions of the Virginia Uniform Commercial Code.[41] The Court also notes the Defendant's own briefing to the Court, suggesting that permitting repossession of the

---

**40.** The Defendant identifies the deposition testimony of named Plaintiff Laura Richards where she admits to use of the car at some point during her ownership of the car to further her housekeeping business. The Virginia Uniform Commercial Code expressly states that a good can have only a single designation at a time. *See* Va.Code § 8.9–109 cmt. 2 (Michie 1991) ("The classes of goods are mutually exclusive...."). That designation is made based upon the predominate use of the good if in dispute. *See id.* The Court is unpersuaded that the testimony of Laura Richards supports the conclusion that her automobile somehow lost its designation as a consumer good. In her deposition, Ms. Richards states that she used the car to drive to and from

her job assignments in domestic cleaning. The utilization of personal automobiles to get to and from one's work does not, under the Virginia Uniform Commercial Code, render an automobile something other than a consumer good automatically. Courts typically resort to consideration of the expressed intent of the parties at the time the security interest attaches to determine the nature of the good in the subject transaction. *See In re Rex Group, Inc.*, 80 B.R. 774, 781 (Bankr.E.D.Va.1987).

**41.** Courts uniformly afford creditors the benefit of a presumption of receipt once a conforming notice is sent when creditors seek deficiency judgments. "There is also a presumption that

vehicle would suffice to demonstrate reliance. "Plaintiffs could argue that making payments to TranSouth or to Falk after receipt of the notice of private sale would indicate detrimental reliance on the notice's statement that Plaintiffs could redeem their automobiles, *as would permitting the cars to be repossessed.*" Defendant's Brief in Support of Motion to Decertify the Class Action at 17 (emphasis added).

### Subclass C Certification Analysis— Damages

■ Furthermore, unlike actual damages, the awarding of statutory minimal damages is made "in any event." Va.Code § 8.9–507(1) (Michie 1991). The Court does not find any reference to or requirement of actual injury by the prevailing party to permit the awarding of the statutory minimum damages according to the formula provided. In fact, the commentary to Virginia Code § 8.9–507 describes the consumer goods statutory provision as a "minimum recovery." Va. Code § 8.9–507 cmt. 1 (Michie 1991). This is consistent with Tennessee case law. *See Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23 (Tenn.Ct.App.1991). "In cases involving consumer goods, debtors are entitled to recover the statutory penalty without regard to their actual loss or their ability to prove that they have been damaged at all." *Id.* at 31.

Case law suggests, and this Court adopts, the position that recovery by a person must be under one theory or the other, but not both. *See First City Bank v. Guex*, 677

S.W.2d 25 (Tex.1984). "Obviously the drafters of the Uniform Commercial Code intended to provide compensation for actual losses incurred when the secured party acted contrary to statute, or to penalize the secured party if the debtor suffered no losses or his losses were less than the statutory penalty." *Id.* at 29.

From this, the Court concludes that if a violation of the Virginia Uniform Commercial Code is demonstrated, all persons to whom a misleading notice was mailed properly and who do not opt for actual damage recovery are eligible for statutory minimum recovery.[42]

■ The statutory minimum recovery is a mathematical calculation set forth in the text of the provision. The Court is confident that the calculation of the statutory minimum damages can be achieved with minimal impact on the Court's workload and while preserving the rights of the parties. *See Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23, 32 (Tenn.Ct.App.1991) (appellate court calculates minimum statutory recovery based solely upon the record to obviate need for wasteful remand to the trial court); *see also Pruitt v. Allied Chem. Corp.*, 85 F.R.D. 100, 117 (E.D.Va.1980) (utilizing Fed.R.Civ.P. 53 to manage tedious inquiries in a class action consistent with the Seventh Amendment).

### D. Treatment of Subclasses

The Court, having concluded that there exist three viable subclasses within the plaintiff class now before the Court, next exam-

---

the posting of a letter to the correct address with the proper postage is evidence of delivery." *See In re Phelps*, 186 B.R. 655, 659 (Bankr.E.D.Va. 1995) (citing *In re Bush*, 166 B.R. 69, 72 (Bankr. W.D.Va.1994)); *see also McGrady v. Nissan Motor Acceptance Corp.*, 40 F.Supp.2d 1323, 1334 (M.D.Ala.1998) ("Thus, as long as proper notice is sent, it need not be received by the debtor to be in accordance with [Alabama Code] § 7–9–504(3)."); *American Honda Fin. Corp. v. DeIorio*, 260 A.D.2d 416, 687 N.Y.S.2d 730 (1999) ("There is no requirement that debtor receive actual notice."); *Ryder v. Bank of Hickory Hills*, 242 Ill. App.3d 1042, 183 Ill.Dec. 762, 612 N.E.2d 19, 23 (1993) ("[Illinois U.C.C. § 9–507] does not require proof of 'actual receipt' by the debtor to

satisfy the reasonable notice requirement."); *Coy v. Ford Motor Credit Co.*, 422 Pa.Super. 76, 618 A.2d 1024, 1027 (1993) ("The term 'to notify,' under the UCC, does not include the notion that the person to whom notice is sent must receive it."). Presently, the Court discerns no principled reason why this presumption should only operate in the favor of the creditor. Thus, the Court disagrees with Defendant's repeated statements that consumers will have to demonstrate receipt of the notice.

**42.** *See supra* note 41 (discussing the presumption of receipt in the consumer credit context).

ines the manner in which best to proceed to trial on these questions. The Court understands that it may, at its discretion, sever the subclasses, try the claims in a certain sequence, and utilize any other procedural tool available to bring this matter to trial.

The Court finds that the three subclasses reflect different of theories of liability and involve the computation of damages. All three, however, allege that liability stems from the one common pattern of activity— the churning scheme that anchors this litigation. Judicial economy would counsel that the Court therefore not sever any subclass into a separate action, nor adopt any particular order of trial as to the subclasses. Instead, the Court finds that a proper jury charge combined with a well-reasoned special verdict sheet and judicial assistance, if required pursuant to Federal Rule of Civil Procedure 53, to be adequate. With the full assistance of trial counsel, this matter remains best solvable by consolidated proceedings as a single class action, recognizing the aforementioned subclasses. Stated differently, the Court believes that overall the treatment of these claims under a single, consolidated class action to be superior to any other form of proceeding.[43]

### V. Conclusion

For the reasons stated above, the Defendant's Motion to Decertify the Class Action is **DENIED.**

Plaintiffs' trial plans are **REJECTED.** Plaintiffs are **ORDERED** to submit within ten (10) days of the date of this Memorandum Opinion a revised Proposed Trial Plan. Defendant shall file any opposition to the revised Proposed Trial Plan within 48 hours of receipt. Plaintiffs may reply in further support of their Plan within 48 hours of receipt of any opposition to the revised Proposed Trial Plan.

The Plaintiffs are **ORDERED** to submit the names and other relevant information

regarding any new named Plaintiffs within ten (10) days of this Memorandum Opinion. If the Defendant wishes to object or make further inquiry into the appropriateness of the new named Plaintiffs, it shall make such wishes known by way of motion filed within four (4) days of receipt of the proposed new named Plaintiffs. The Court will address such objections and requests at that time.

Upon approval of new class representatives, the Plaintiffs shall be ordered to give notice to the class members of the new subclasses and of the representatives for each subclass.

The Clerk of the Court is **DIRECTED** to send a copy of this Memorandum Opinion and Order to Gregory N. Stillman, Esquire, counsel for the Defendant and to Kieron F. Quinn, Esquire and Stephen C. Swain, Esquire, counsel for the Plaintiffs.

**IT IS SO ORDERED.**

---

**43.** To the extent that the parties raise any further arguments regarding the class or proposed trial plans, the Court finds those arguments to be of little utility in this analysis and mooted by the Court's decision in this Order.